SCHUBERT, Respondent, vs. MIDWEST BROADCASTING COMPANY, Appellant.

*September 10—October 8, 1957.*

For the appellant there was a brief and oral argument by *A. L. Skolnik* of Milwaukee.

For the respondent there was a brief by *Marshutz, Hoffman & Hallows,* attorneys, and *Ellis R. Herbon* of counsel, all of Milwaukee, and oral argument by *Mr. Herbon.*

BROADFOOT, J. Walter Schwimmer Productions, Inc., was the producer and owner of a television quiz program called "Movie Quick Quiz." In January, 1954, the defendant operated a television broadcasting station in Milwaukee. On January 4, 1954, a contract was entered into between Walter Schwimmer Productions, Inc., hereinafter referred to as the "producer," and the defendant whereby the defendant was licensed to produce and agreed to telecast the Movie Quick Quiz over its station for a period of two years beginning January 11, 1954, with an option to cancel after the first fifty-six weeks. The producer agreed to furnish the defendant prints of minute movies, supply question and answer material, instructions for the operation and presentation of the show, and all other materials necessary except for items agreed to be furnished by the defendant. The show was to be furnished by the producer during the first four weeks without charge. Thereafter the defendant was to pay the producer the sum of $100 per week except that the price was to be $150 per week in case the defendant sold the program to one sponsor. In addition to the films and materials, the producer agreed to furnish a minimum of five and a maximum of 15 United States savings bonds per week with a face value of $25 each for jackpots. In return therefor the defendant agreed to schedule the bonds as prescribed by the producer and to use free advertising called plugs for bond donors as submitted by the producer. Defendant used the show from January 11, 1954, until April 30, 1954. On April 22, 1954, the producer and the defendant executed an amendment to the contract as follows:

"Producer grants station a hiatus following the telecast of April 30, 1954, and returning to the air on or before September 6, 1954. This eighteen-week period will be added to the firm period agreed to in the original contract, making June 10, 1955, the first cancellation date."

In August, 1954, the defendant communicated with the producer indicating its inability to restore telecasting of the show on September 6, 1954, and the contract was again amended by extending the hiatus period to October 6, 1954. Telecast of the program was never resumed by the defendant.

In November, 1954, Walter Schwimmer Productions, Inc., assigned its contract to the plaintiff. Walter Schwimmer, president of the Walter Schwimmer Productions, Inc., continued negotiations with the defendant for restoration of the telecast of the program on behalf of the plaintiff pursuant to authority from him.

On February 10, 1955, the producer was notified that the defendant was suspending operations at midnight on February 26th. Thereafter the present action was commenced to recover the sum of $4,040. For the twelve weeks during which the show was telecast the defendant had paid the sum of $1,160 and plaintiff claimed the sum of $4,000 for the remaining period of forty weeks during which the defendant had failed, neglected, and refused to perform its part of the contract. The first answer to the complaint admitted that the defendant owed the plaintiff the sum of $40, but by way of defense alleged that the parties had mutually agreed to rescind the contract. Later, with leave of the court, the defendant filed an amended answer alleging as a second defense that the defendant had been induced to sign the contract by means of false and fraudulent representations on the part of the producer.

Upon this appeal the defendant makes no contention that the contract was rescinded by mutual agreement. To substantiate its allegations of fraud the defendant's manager

testified that the producer's sales manager agreed to furnish two sponsors for the program and to donate certain valuable merchandise prizes for award to viewers of the program as consolation prizes when they failed to answer the jackpot question. Those allegations were denied by Mr. Schwimmer and by the sales manager for the producer. Much correspondence between the producer and the defendant appears in the record. Defendant's manager testified that the producer's failure to provide sponsors and additional prizes was known to the defendant prior to the time the program was taken off the air. In spite of this knowledge the defendant executed two amendments to the contract and sought further delay in the resumption of telecasting the show.

We have carefully reviewed the record and are satisfied, as was the trial court, that the defendant failed to establish its allegations of fraud by the clear and satisfactory evidence required.

In support of its motion for a new trial the defendant filed two affidavits to which were attached five letters, three written to the defendant by the producer's sales manager and two written to the producer by the defendant. It was alleged in one of the affidavits that those letters had been delivered to an attorney for the defendant who was not employed by the defendant for the purposes of this trial; that said letters were returned to the defendant by said attorney after the trial. In a memorandum decision on the motion the trial judge stated that he had carefully considered the affidavits and the letters in the light of the testimony adduced at the time of the trial and that even if he construed them most favorably to the defendant there would be no change in the outcome of the case.

We, too, have carefully considered the affidavits and the letters, and we can find no error on the part of the trial court in denying a new trial.

The defendant finally contends that the damages found by the trial court are excessive. The trial court relied upon cases cited in an annotation in 17 A. L. R. (2d) on page 968. This annotation refers mainly to particular types of contracts that call for exceptions to the general rule for establishing damages in breach-of-contract cases. Based upon these cases the trial court held that the *prima facie* measure of damages in this case is the contract price with the burden on the defendant to establish savings to the plaintiff from relief of performance.

We do not believe that to be a correct statement of the rule for the determination of damages in this case. The fundamental idea in allowing damages for breach of contract is to put the plaintiff in as good a position financially as he would have been in but for the breach. Damages are the compensation which the law will award for an injury done. Plaintiff was entitled to a performance of the contract. Any savings made by the plaintiff because he was not required to perform the contract for the balance of the term thereof are to be deducted from the value of the performance which the defendant should have paid. The defendant promised the plaintiff a fixed price for performing the contract. Plaintiff's damages are that sum less any savings accruing to plaintiff because he was not able to complete the contract. The burden of proof was upon the plaintiff to establish his loss. We feel there should be few exceptions to this general rule because only the plaintiff has the knowledge and the figures to prove that saving. In Restatement, 1 Contracts, p. 515, sec. 331, and p. 533, sec. 335, is the general rule for establishing the amount of damages. These sections read as follows:

"(1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Sec. 331.)

"If the defendant's breach of contract saves expense to the plaintiff by discharging his duty of rendering a performance in return or by excusing him from the performance of a condition precedent, the amount of this saving is deducted from the damages that would otherwise be recoverable." (Sec. 335.)

The Wisconsin annotations to these sections show that they are in accord with the Restatement. Compliance with the rule of reasonable certainty does not make it necessary for the plaintiff to prove his savings with mathematical accuracy. It is sufficient if they can be estimated by the trier of the facts with a reasonable degree of certainty. The party who breaches a contract is a wrongdoer. In cases involving the type of contract here presented the defendant knows it is impossible to prove savings to a mathematical certainty and he, as the wrongdoer, should not be allowed to profit by his own wrong.

Among other cases the defendant cites *King Features Syndicate v. Courrier,* 241 Iowa, 870, 882, 43 N. W. (2d) 718, 41 A. L. R. (2d) 467. We believe that case properly states the rule of damages to be applied here. In that case the Iowa court said:

"We think the proof here of damages for loss of profits was reasonably certain and the cost-of-performance figure, used to diminish the gross payments due, did not need to include what might be termed the overhead or fixed expenses, as argued by defendants. The record shows such items of expense would be constant whether this contract was performed or not. This being true, they were of no interest on the question of damages for nonperformance.

"In answering a similar argument as that presented by the defendants here, the court in *Oakland California Towel Co. v. Sivils, supra* [52 Cal. App. (2d) 517, 520, 126 Pac. (2d) 651, 652], said: '. . . the true rule seems to be that the prospective profits should be diminished by charges composing an essential element in the cost of manufacture, or, as in this case, of service. Essential elements in such cost do not

include remote costs, overhead or otherwise, but are confined to expenditures that would necessarily have been made in the performance of the contract. The only matter of concern is the detriment suffered or benefit lost as the result of the breach. If the fixed expenses neither increased nor decreased as a consequence of the nonperformance of the contract, there would be no loss or benefit arising from that factor.' "

With those rules in mind we carefully reviewed the testimony with reference to damages. Walter Schwimmer testified that in assembling the films and materials for his television show he had a total investment therein of approximately $400,000. He was not required to produce any new films after 1953. Approximately 50 stations were televising the show at the time the contract was signed. There were enough films and materials in being to service over 100 stations. He employed a company to transmit the films and materials between the different television stations. This was done at a cost of $3 per week per station. He further testified that no money other than this $3 a week was saved by reason of defendant's failure to telecast the show.

Schwimmer testified that the bonds to be furnished under the contract were donated by advertisers in exchange for free advertising on the show. In addition to the television show Schwimmer had two radio quiz shows and the stations using such shows were also furnished government bonds as prizes. His license contracts for his radio shows numbered from 250 to 350. The exact number of license contracts for the television show that were assigned to the plaintiff does not appear of record. At the time of signing the contract with the defendant Schwimmer had about 50 similar contracts. At the peak he had about 75 such contracts. Schwimmer maintained a prize department in New York for soliciting the bonds for all of the shows. The overhead for maintaining this department was fixed and no saving in the expense of operating his office was effected because one subscriber did not televise the show. Schwimmer further testified that there

were bond donors available for the defendant during the entire life of the contract. His testimony shows that it would be impossible to compute the cost to service one station with the bonds or to break down the expense as to cost per station. His expenses for maintaining the prize department were approximately $1,200 a month for rent, light, telephone, telegrams, postage, and salaries.

Had Schwimmer retained the television show the record sustains his contention that there would be no saving because one licensee failed to carry out his agreement. The overhead of the New York office would be the same whether it was servicing 300 or 301 shows. The record is not so clear as to the plaintiff Schubert, to whom the Movie Quick Quiz materials and contracts were assigned in November, 1954. Schubert did not testify at the trial. Schwimmer testified that Schubert, until further notice, was going to get the bonds through Schwimmer's New York office and that he agreed to pay approximately 50 per cent of the expense of that office. If Schubert's cost was $600 per month and if he had 50 contracts for the television show, his cost would be $12 per month per station. If he had more contracts the monthly cost per station would be less, if all required equal service. We are not, however, looking for costs but for savings. His overhead was fixed at $600 per month and if he serviced 51 contracts rather than 50, or 76 instead of 75, his overhead would be the same and there would be no saving through servicing one less station.

The trial court held that plaintiff was entitled to judgment for $4,040 less any savings effected because he was not required to perform the contract. The trial court determined from the evidence that the only saving to the plaintiff would be $3 per week for transportation and that no other saving resulted. The record sustains those findings, and we reach the same result by applying the general rule cited above.

*By the Court.*—Judgment and order affirmed.