REIMAN ASSOCIATES, INC., a Wisconsin corporation, and Roy Reiman, Plaintiffs-Respondents and Cross-Appellants,

v.

R/A ADVERTISING, INC., now known as Bader Rutter & Associates, Inc., a Wisconsin corporation, and Ronald L. Bader and James Rutter, Defendants-Appellants and Cross-Respondents.†

Court of Appeals

*No. 80–902. Submitted on briefs December 17, 1980.—
Decided April 27, 1981.*
(Also reported in 306 N.W.2d 292.)

_____
† Petition to review denied.

For the defendants-appellants and cross-respondents the cause was submitted on the briefs of *Weiss, Steuer, Berzowski & Kriger* and *Robert K. Steuer* and *Thomas L. Skalmoski,* of counsel, of Milwaukee.

For the plaintiffs-respondents and cross-appellants the cause was submitted on the brief of *Quarles & Brady* and *Ronald L. Wallenfang* and *John A. Rothstein,* of Milwaukee.

Before Decker, C.J., Moser, P.J., and Cannon, J.

DECKER, C.J.   This appeal centers around a covenant not to compete incidental to the sale of a business. The individual defendants are not parties to this appeal.[1] The corporate defendant appeals from a judgment awarding plaintiffs damages for breach of the covenant

---

[1] In their notice of cross-appeal, plaintiffs specified as objectionable that portion of the judgment dismissing with prejudice their complaint against the individual defendants. That issue has not been briefed or argued on appeal, and we deem it abandoned. *See McGivern v. Amasa Lumber Co.,* 77 Wis.2d 241, 245, 252 N.W.2d 371, 373 (1977).

not to compete, and plaintiffs cross-appeal from the trial court's reduction of damages.[2] We affirm.

Reiman Associates, Inc. (plaintiff-corporation), is engaged in the business of producing agricultural publications and is wholly owned by plaintiff Roy Reiman. From 1970 until the commencement of this lawsuit in 1978, plaintiff-corporation produced a quarterly publication, the *Landhandler*, for Allis-Chalmers Corporation. The publication consisted of photographs, articles of interest to farmers, and advertisements for Allis-Chalmers agricultural equipment, and was distributed by Allis-Chalmers to approximately 500,000 farmers through its dealer network.

Plaintiff-corporation formed defendant R/A Advertising, Inc. (defendant), in 1973 to engage in the advertising business at the suggestion of Allis-Chalmers, which wanted to place the *Landhandler* with one entity that could produce all aspects of the publication, including the Allis-Chalmers advertisements. Defendant Ronald L. Bader was hired as president of defendant and pursued the Allis-Chalmers advertising account. Defendant James Rutter was hired to manage the Allis-Chalmers account when it was awarded to defendant in 1974.

Both corporations shared the same floor in the same building, although they had separate offices. When an issue of the *Landhandler* was completed, plaintiff-corporation would bill defendant for production costs, which defendant would add to its advertising costs in submitting one complete production bill to Allis-Chalmers.

In 1974, plaintiff-corporation sold 100 per cent of the stock of defendant to Bader and Rutter, and the corpora-

---

[2] Contrary to plaintiffs' practice in this case, *see* note 1, *supra*, the rule governing cross-appeals, sec. 809.10(2)(b), Stats., does not require specification of issues in the notice of cross-appeal, but only specification of the judgment or order sought to be modified. Therefore, we address the reduction of damages issue because it arises from the judgment specified in the notice of cross-appeal.

tions exchanged covenants not to compete. Plaintiff-corporation covenanted that it would not hold itself out as an advertising agency "within the agricultural industry within the United States of America" until after August 30, 1981. Defendant covenanted that it would not compete with plaintiff-corporation "for the business of producing the *Landhandler*," and "in the business of publishing magazines," and that it would not "solicit clientele engaged in the agricultural business for the primary purpose of securing 'publication' type business." Defendant paid plaintiff-corporation $200,000, of which $20,000 was allocated to the transfer of corporate stock and $180,000 to payment for plaintiff-corporation's covenant not to compete in the agricultural advertising business. It was understood by the parties that defendant would hire from plaintiff-corporation Garry Myers, managing editor of the *Landhandler*.

This action was commenced when, in early 1978, defendant submitted a bid to Allis-Chalmers for publication of the *Landhandler*.

At the close of evidence, the trial court ruled as a matter of law that the covenant "R/A agrees it will not compete for the business of producing the *Landhandler*" was reasonable and thus enforceable, and ruled that defendant breached this covenant by submitting a bid to Allis-Chalmers. The case against Bader and Rutter was dismissed because no evidence was adduced against them as individuals. The jury found that defendant's breach was causal of plaintiffs' damages and awarded $176,-109.19 damages. On motions after verdict, the trial court ordered a new trial unless plaintiffs accepted a reduced award of $153,000. Plaintiffs accepted and judgment was entered.

Defendant appeals, arguing that:

(1) the covenant not to compete is unreasonable and thus unenforceable;

(2) it was error to give a special jury instruction on the credibility of one of defendants' exhibits;

(3) the causation question was resolved through speculation; and

(4) there was no credible evidence to support a damage award.

Plaintiffs cross-appeal, contending that the trial court erred in reducing damages.

## COVENANT NOT TO COMPETE

If a covenant not to compete is unreasonable, it is unenforceable. *Milwaukee Linen Supply Co. v. Ring,* 210 Wis. 467, 474, 246 N.W. 567, 569 (1933); Restatement of Contracts §514 (1932). Whether such a covenant is reasonable is a matter of law to be determined from the writing, *My Laundry Co. v. Schmeling,* 129 Wis. 597, 613, 109 N.W. 540, 547 (1906), and is determined "with reference to the particular case." *Milwaukee Linen, supra,* 210 Wis. at 473, 246 N.W. at 569; *accord, My Laundry, supra,* 129 Wis. at 609, 109 N.W. at 549. In determining reasonableness, the court must examine whether the covenant is

(1) reasonably necessary for the protection of the beneficiary;

(2) reasonable as between the parties, and particularly as to the party restrained, considering time, space, purpose, and scope; and

(3) not specially injurious to the public.

*My Laundry, supra,* 129 Wis. at 609, 109 N.W. at 549. *Accord,* Restatement of Contracts §515 (1932).

Covenants not to compete incidental to the sale of a business are not subject to exacting scrutiny, particularly where, as here, the covenants contain no restriction

on the right of the restrained party to enter employment. *Betten Co. v. Brauman,* 218 Wis. 203, 208, 260 N.W. 456, 458 (1935). *See* Restatement of Contracts §516(b) (1932). Additionally, covenants incidental to the sale of a business benefit from full application of the rule of partial enforcement: even an unreasonable restraint will be enforced to the extent necessary and reasonable under the circumstances. *Fullerton Lumber Co. v. Torborg,* 270 Wis. 133, 142–48, 70 N.W.2d 585, 589–92 (1955). *Cf. Lakeside Oil Co. v. Slutsky,* 8 Wis.2d 157, 161, 98 N.W.2d 415, 419 (1959) (operation of the rule of partial enforcement on covenants incidental to employment contracts changed by sec. 103.465, Stats.). Applying the rule of partial enforcement in this case, we find the covenant by defendant not to compete with plaintiff-corporation "for the business of producing the *Landhandler*" to be patently reasonable as a matter of law.[3]

The covenant was reasonably necessary for the protection of plaintiff, the beneficiary, because:

(1) at the time of the sale, plaintiff-corporation had no more than five or six publications, of which *Landhandler* was a major account;

(2) as part of the sale, defendant hired from plaintiff-corporation Garry Myers, who was then managing editor of *Landhandler;*

---

[3] We expressly do not rule on the reasonableness of the covenants by defendant that it would not compete with plaintiff-corporation "in the business of publishing magazines" and would not "solicit clientele engaged in the agricultural industry for the primary purpose of securing 'publication' type business," because the record contains no evidence that these covenants are necessary for plaintiff-corporation's protection in this case. *See Fullerton Lumber, supra,* 270 Wis. at 148, 70 N.W.2d at 592–93. We note that the record establishes that defendant was producing two agricultural dealer-publications at the time it submitted its bid for the *Landhandler,* and had won an industry award for the quality of one of them.

(3) while defendant was a subsidiary, the individual defendants were introduced to and became acquainted with the key people at Allis-Chalmers who handled the *Landhandler;* and

(4) after the sale, defendant continued to produce Allis-Chalmers advertising for the *Landhandler,* and maintained contact with the key people at Allis-Chalmers.

It is clear that plaintiff would have been harmed by loss of the *Landhandler* and that after the sale defendant had sufficient potential capability and opportunity to enter the production business and possibly cause this loss.[4] This satisfies the test of reasonable necessity as to plaintiff-corporation, the beneficiary of the covenant.

The covenant was reasonable as between the parties and as to defendant, the party restrained, considering time, space (see note 6, *infra*), purpose, and scope. As in *Kradwell v. Thiesen,* 131 Wis. 97, 100, 111 N.W. 233, 234 (1907), "There is no ground for claiming the contract in question is general or unlimited." The covenant is limited to a definite time period of less than six years.[5] Courts have sustained as valid covenants inci-

---

[4] Bader testified that at the time of sale defendant did not have sufficient personnel to enter into the production business. The record reflects that at or immediately after the sale, defendant-corporation hired from plaintiff-corporation not only Garry Myers, the managing editor of the *Landhandler,* but its field editor who had solicited and gathered freelance articles and photographs for the *Landhandler,* and a member of plaintiff-corporation's production department who had placed each issue of the *Landhandler* in page format for the printer. At trial an employee of Allis-Chalmers testified that one of the key reasons defendant's 1978 bid was favored was because of production ideas formulated by "Garry Myers and his group."

[5] The agreement containing the covenants is dated October 6, 1975, and states that it will be effective until August 30, 1981. The parties to this appeal have adopted this time period in their briefs.

dental to the sale of a business without time limitation in specified localities. *Madson v. Johnson,* 164 Wis. 612, 614, 160 N.W. 1085, 1086 (1917). Here, not only does the covenant contain a specific time limitation, but it is also limited to a specific publication, the *Landhandler.*[6] We have already found reasonable the purpose of the covenant, retention of plaintiff-corporations's major account despite giving up its *Landhandler* managing editor. The covenant is reasonable as between the parties and as to defendant.

The covenant is not specially injurious to the public. "It has long been the rule in this state that agreements although in partial restraint of trade, where effected for a proper purpose and limited in time and scope and otherwise reasonable are not invalid." *Johnson v. Shell Oil Co.,* 274 Wis. 375, 381, 80 N.W.2d 426, 429 (1957). We have already held that the covenant in question is reasonable considering time, purpose, and scope. Under *My Laundry, supra,* 129 Wis. at 609, 109 N.W. at 549, if a covenant is reasonable considering time, space (see note 6), purpose, and scope, it is not specially injurious to the public.

Defendant argues that the covenant ceased being reasonably necessary for the protection of plaintiff-corporation less than a year after it was executed because the *Landhandler* changed format from a national to a regional publication with four separate editions. Defendant reasons that any knowledge it had of the *Landhandler* at the time of sale became obsolete upon regionalization. This argument ignores evidence that:

(1) prior to the sale Bader had been a key person involved in negotiations and cost estimates between plain-

---

[6] Because this covenant is limited to a specific publication, consideration of space, which refers to territorial restrictions, is inapplicable.

tiff-corporation and Allis-Chalmers concerning regionalization;

(2) regionalization was not a complete production change because the center pages of each regional edition, comprising half the content of each, were the same;

(3) almost one-fourth of each issue before and after regionalization consisted of advertising prepared by defendant-corporation; and

(4) after the sale, defendant enjoyed a continued close relationship with key personnel at Allis-Chalmers.

Defendant also argues that lack of necessity to plaintiff-corporation is shown because besides the covenant in question, $180,000 was given in exchange for plaintiff-corporation's covenant not to compete in the advertising business. This argument fails because defendant's covenant was part of the consideration, and without it, plaintiff-corporation doubtlessly could have and would have commanded more monetary consideration.

Defendant relies on cases involving covenants not to compete incidental to employment contracts to argue lack of necessity to plaintiff-corporation because the covenant protects plaintiff-corporation only from "legitimate and ordinary competition of the type that a stranger could give." *See, e.g., Lakeside Oil Co. v. Slutsky, supra,* 8 Wis.2d at 163, 98 N.W.2d at 419 (1959). Defendant points out that a "stranger," the third bidder for the *Landhandler,* submitted a bid substantially lower than plaintiff-corporation's. This argument ignores testimony by Don Nelson, advertising manager for the agricultural equipment section of Allis-Chalmers, that this firm had been submitting bids lower than plaintiff-corporation's billings since early 1975, yet had been consistently rejected because of the unknown quality of its work and because plaintiff-corporation was familiar with Allis-Chalmers' market strategy style of

doing business. By contrast, defendant had prepared advertising for Allis-Chalmers since 1974, and Allis-Chalmers noted in its evaluation of bids that defendant "has continually given us fine quality literature," and "offers top production and planning personnel."

Defendant argues that the covenant is specially injurious to the public, "specifically Allis-Chalmers," because by restraining defendant from submitting a bid for the publication of *Landhandler*, it deprives Allis-Chalmers of the advantages of competition. This covenant is not specially injurious to the public because the business of competing with plaintiff-corporation for production of the *Landhandler* is open to anyone except defendant, which is excluded only temporarily. *See Cottington v. Swan*, 128 Wis. 321, 325, 107 N.W. 336, 337 (1906).

Defendant's reliance on *Grams v. Boss*, 97 Wis.2d 332, 294 N.W.2d 473 (1980), is misplaced. That case arose under Wisconsin's mini-Sherman Act, sec. 133.01, Stats., and involved an agreement amounting to a conspiracy among defendants to drive the plaintiff out of business. Here, we are concerned with a limited covenant not to compete incidental to the sale of a business entered into freely by the party now complaining and given in exchange for a similar covenant. Covenants not to compete will always tend to suppress some competition. This alone does not make them unreasonable; otherwise, no such covenant would ever be enforceable. This covenant, voluntarily assumed by a corporation primarily engaged in the advertising business at the time of sale, does not violate public policy.

Defendant's final argument attacks both reasonableness of the covenant as to it, the restrained party, and the trial court's determination as a matter of law that a breach of the covenant occurred. Defendant repeatedly argues that the covenant as written restrained it

only from affirmatively pursuing publication of the *Landhandler*,[7] and that a construction of the covenant which prohibits defendant from "merely responding" to a request to submit a bid results in undue hardship to it.[8] This argument is based on a statement in the underlying sales agreement that "[t]he parties agree that the singularly most significant factor in the success of the [defendant's] business is the continuing relationship of the [defendant] to its major clients." Defendant reasons that to continue its relationship with Allis-Chalmers, it had to respond to the request for a production bid to avoid "snubbing" its largest client. This argument ignores preceding language in the sales agreement that defendant "is engaged in the general advertising business in Milwaukee, Wisconsin." We reject the contention that defendant, "engaged in the general advertising business," would have to enter the *production* business to avoid snubbing an *advertising* client. Allis-Chalmers and defendant enjoyed a relationship arising out of defendant's advertising business, and it is this relationship as an advertising agency which defendant allegedly seeks to protect through entering the production business. This relationship, by the terms of the agreement between the parties, is to be protected through plaintiff-corporation's adherence to its covenant that for nearly six years it would "not at anytime hold itself out within the agricultural industry in the United States of America to be an ad-

---

[7] This argument might be a reasonable construction of defendant-corporation's covenant that it would not "solicit clientele engaged in the agricultural industry for the primary purpose of securing 'publication' type business," but that covenant is not before us. See note 3, *supra*.

[8] Restatement of Contracts §515 (1932) provides that "[a] restraint of trade is unreasonable in the absence of . . . dominant social or economic justification if it . . . (b) imposes undue hardship upon the person restricted . . . ."

vertising agency. . . ." We detect no undue hardship to the defendant in enforcing the reciprocal covenant.

## SPECIAL INSTRUCTION

Defendant contends that the trial court erred in giving a special instruction to the jury regarding the credibility of Exhibit 9. In this instruction, the trial court called the jury's attention to the exhibit, told the jury that a document prepared for use in litigation is less trustworthy than one prepared in the regular course of business, charged the jury with determining whether the exhibit was prepared in the regular course of business or for use in litigation, and listed factors which the jury could consider in making its determination.[9] The ex-

[9] The challenged instruction reads:

I want to give you one special instruction about Exhibit 9. Exhibit 9, if you will recollect, was the evaluation done by the people —Miss Quinn was one of them and I forgot the other gentleman's name. Exhibit 9 was introduced as a purported evaluation of the Reiman, Bader Rutter, Market Communications bids—and the reason I use purported is that based on this instruction it is going to be your determination, based upon the facts, as to whether or not this was an evaluation or not—and has been admitted into evidence. The law in this area is that a document made or prepared for use in litigation and not for the regular course of business is less trustworthy, than one which would be made for the regular course of business.

It is for you to determine, as triers of the fact, as to whether or not that document was made or prepared for use in litigation. Some of the factors you may use, in addition to the factors I just defined for you in the previous instruction on witnesses, you may use those factors also, some of the factors you may consider are sources of information or other circumstances surrounding the preparation of the document, including preparence [sic], motive to misrepresent, when the report was made, and the possible motives of creating this report other than for business reasons. You may consider whether the report was used or intended to be used by Allis-Chalmers in the regular course of their business. Now, I am leaving it up to you to make the determination.

hibit, entitled "Landhandler Creative Evaluation" and dated June 29, 1978, is a comparative analysis of bids submitted for production of the *Landhandler* which was prepared by Kathleen Quinn and Dean Carpenter of Allis-Chalmers. When viewed in isolation, the exhibit supports defendant's contention that plaintiff-corporation would have lost the *Landhandler* account to another bidder even if defendant had not submitted a bid.

Defendant argues that there was no evidence in the record that Exhibit 9 was prepared for use in litigation, and therefore it was error for the trial court to give the special instruction. "An instruction must be warranted by the evidence and it should not be given where the evidence does not support it." *Foss v. Town of Kronenwetter,* 87 Wis.2d 91, 106, 273 N.W.2d 801, 809 (1978). In support of this argument, defendant marshals evidence supporting its position that Exhibit 9 was prepared in the ordinary course of Allis-Chalmers' business, including evidence that Allis-Chalmers had been in the process of evaluating the overall cost of the *Landhandler* since 1975, that solicitation of production bids was a normal step in this process, and that the exhibit reflected an objective evaluation of the bids received.

While this evidence supports the trial court's preliminary determination to admit the exhibit as a business record, it does not address the question of whether there was evidence to support the instruction given. The jury had evidence before it that the evaluation was dated after Allis-Chalmers knew of the existence of the covenant not to compete, after it was notified of commencement of the instant action, and after it had been threatened with a lawsuit for inducing breach of defendant's covenant not to compete. Additionally, the evidence before the jury reflects that the evaluation was prepared by Allis-Chalmers employees:

(1) one or two months after the second-ranked bidder had been notified by both the preparer of the evaluation and her supervisor that its bid had been rejected;

(2) after the preparer and other Allis-Chalmers employees had twice visited defendant to discuss production of the *Landhandler;*

(3) after plaintiff-corporation had been notified that the *Landhandler* had been awarded to defendant;

(4) after defendant had begun production work on an issue of *Landhandler;* and

(5) after defendant had notified freelance writers that it was producing the *Landhandler,* prompting at least one writer to send defendant articles he had intended to send to plaintiff-corporation. There was ample evidence before the jury to support use of the special instruction.

There is no inconsistency in admission by the trial court of Exhibit 9 as a "business record" and its subsequent submission to the jury for consideration of whether it was not a business record but prepared for use in litigation. The standard of proof for admissibility of evidence subject to a *preliminary* fact determination pursuant to sec. 901.04(1), Stats., is prescribed as evidence sufficient to support a finding of the fact. Sec. 901.04(2). However, the jury is the final arbiter of the weight and credibility of that testimony. *Collier v. State,* 30 Wis.2d 101, 107, 140 N.W.2d 252, 255 (1965); sec. 901.04(5), Stats.

Defendant argues that the instruction as given assumes, and gives undue prominence to, plaintiffs' contention that Exhibit 9 was prepared for use in litigation. *See Foss v. Town v. Kronenwetter, supra,* 87 Wis.2d at 106, 273 N.W.2d at 809.

This argument is without merit. The trial court did not tell the jury that Exhibit 9 *was* a document prepared for use in litigation. The jury was charged with

determining whether Exhibit 9 was an evaluation prepared in the regular course of business, or whether it was a document prepared for use in litigation. While the instruction listed factors relevant to determining whether Exhibit 9 was prepared for use in litigation, it also listed factors relevant to determining whether Exhibit 9 was prepared in the ordinary course of business. The instruction contains no assumptions as to disputed facts, and gives equal prominence to the contentions of all parties.

Defendant contends that the trial court misstated the law because it instructed the jury that a document made for use in litigation is, by virtue of that fact alone, less trustworthy than one made in the regular course of business. We agree with defendant that the critical issue in determining whether a document is untrustworthy as one prepared for use in litigation is the possibility of a motive to misrepresent. *See, e.g., Kuhlman, Inc. v. G. Heileman Brewing Co.,* 83 Wis.2d 749, 761–63, 266 N.W.2d 382, 389 (1978) ; 4 J. Weinstein & M. Berger, Weinstein's Evidence para. 803 (6) [07] (1979). We do not agree that the instruction as given was erroneous. The trial court instructed the jury that it could consider motive to misrepresent as a factor in determining whether Exhibit 9 was prepared for use in litigation. While this factor is only one of several listed by the trial court, all of the other factors listed are traditionally considered evidence of motive to misrepresent, *see e.g.,* Weinstein, *supra,* para. 803 (6) [07] at 803–177 to 178, and motive to misrepresent was emphasized a second time at the end of the list of factors ("possible motives of creating this report other than for business reasons" could be considered by the jury.) We find no prejudicial error. It cannot reasonably be said that the instruction probably, as opposed to possibly, misled the

jury. *See Kuhlman, supra,* 83 Wis.2d at 757, 266 N.W. 2d at 386.

## CAUSATION

Because the special verdict and companion jury instruction on cause asks whether defendant's breach was "a substantial factor" in causing plaintiffs' damages, if any, defendant argues that plaintiffs' burden of proof was erroneously lessened. Defendant argues that because losses from breach of contract must necessarily flow from the breach, *see e.g., Dehnart v. Waukesha Brewing Co.,* 21 Wis.2d 583, 595–96, 124 N.W.2d 664, 670 (1963), plaintiffs must prove that defendant's breach was *the* cause of plaintiffs' damages. We reject this argument.[10]

*Dehnart* addresses measure of damages, not causation, and merely reflects Wisconsin's long adherence to the doctrine of *Hadley v. Baxendale,* 9 Exch. 341, 156 Eng. Rep. 145 (1854), for measuring damages in contract cases. *See, e.g., Foss v. Heineman,* 144 Wis. 146, 149, 128 N.W. 881, 883 (1910), *Cockburn v. Ashland Lumber Co.,* 54 Wis. 619, 626–27, 12 N.W. 49, 51–52 (1882). Under this doctrine, the sum awarded must compensate the wronged party for damages which arise naturally, "according to the usual course of things," from the wrong, and must be such as is "reasonably to be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it." *Foss v. Heineman, supra,* 144 Wis. at

---

[10] While there is no question that defendant preserved its right to challenge the cause question on appeal, we note that defendants' first set of proposed jury instructions defined cause in terms of "a substantial factor." This may explain the trial court's surprise when defendants subsequently objected to its use of the "a substantial factor" test.

149, 128 N.W. at 883; *Hadley v. Baxendale, supra,* 9 Exch. at 354, 156 Eng. Rep. at 151. The trial court was faithful to this doctrine for the measure of damages, instructing the jury that damages must flow directly and necessarily from the breach of contract, and must be reasonably foreseeable at the time the contract was made as a probable result of the breach.

Most cases concerned with the question of cause in contract actions simply inquire whether the damages were "caused" or "a result of" the breach. Ordinarily a cause-in-fact determination in contract actions, no matter how phrased, is circumscribed by a jury instruction that incorporates the doctrine of *Hadley v. Baxendale, supra.* See 5 A. Corbin, Corbin on Contracts §1019 (1964); Restatement of Contracts §330, comment b. (1932) (foreseeability compared with remoteness and intervening events). Modern authority has, for the most part, rejected any distinction between the cause-in-fact determination question in tort and contract actions.[11] R. Dunn, Recovery of Damages for Lost Profits §1.1 at 3–4 (1978). *Accord,* 5 Corbin on Contracts §997 (causation determination the same whether applied in the field of contracts or torts).

---

[11] In negligence actions, legal cause is made up of two components, cause-in-fact (tested by whether the negligent act was "a substantial factor" in producing the injury), and "proximate cause," or policy considerations, *Morgan v. Pennsylvania Gen. Ins. Co.,* 87 Wis.2d 723, 735, 275 N.W.2d 660, 666 (1979), which may preclude liability even if cause-in-fact is found. *Id.* at 737, 275 N.W.2d at 666.

That the doctrine of *Hadley v. Baxendale* serves as a limitation on cause-in-fact in contract cases finds support in *Richmond v. Cretens,* 175 Wis. 297, 302, 185 N.W. 247, 249 (1921), where our supreme court restated the doctrine in terms of "proximate cause": "Damages resulting from the refining of the product, therefore, were plainly within the contemplation of the parties to the contract of sale, and constituted a proximate result of the breach of the warranty."

The tort cause-in-fact determination has been defined in terms of "a substantial factor" in Wisconsin ever since *Pfeifer v. Standard Gateway Theater Inc.*, 262 Wis. 229, 236–37, 55 N.W.2d 29, 33 (1952). Use of this terminology in contract actions finds support in 5 Corbin on Contracts §999:

> In all cases involving problems of causation and responsibility for harm, a good many factors may have united in producng the result; the plaintiff's total injury may have been the result of many factors in addition to the defendant's tort or breach of contract. Must the defendant pay damages equivalent to the total harm suffered? Generally the answer is Yes, even though there were contributing factors other than his own conduct. Must the plaintiff show the proportionate part played by the defendant's breach of contract among all the contributing factors causing the injury, and must his loss be segregated proportionately? To these questions the answer is generally No.[12] *In order to establish liability the plaintiff must show that the defendant's breach was "a substantial factor" in causing the injury.* (Emphasis added, footnotes in original deleted, footnote inserted).

Because the trial court instructed the jury as to the doctrine of *Hadley v. Baxendale,* we detect no error in its use of the "a substantial factor" test in instructing the jury and phrasing the cause-in-fact question.

Defendant argues that regardless of how the cause question is phrased, its conduct did not cause plaintiff-corporation's loss of the *Landhandler.* This theory of absence of causation was presented to the jury in opening and closing, and obviously was rejected. "On appeal the obligation of this court is to search for credible evidence that will sustain the verdict, not for evidence to sustain a verdict the jury could have but did not reach." *Meurer v. ITT General Controls,* 90 Wis.2d 438, 450–51, 280 N.W.2d 156, 162–63 (1979).

---

[12] Because of the limiting doctrine of *Hadley v. Baxendale,* apportionment has not been a concern in contract cases.

There is sufficient evidence in the record to establish that the instant lawsuit was the direct cause of Allis-Chalmers' decision to place production of the *Landhandler* in-house. Allis-Chalmers never solicited a bid from its internal division until after this lawsuit was commenced, and prior to commencement had visited defendant twice to discuss production, had notified plaintiff-corporation that the *Landhandler* had been awarded to defendant, and had notified the only other bidder that it had not made the final cut. The subsequent per-issue bid from Allis-Chalmers' internal division was higher than that of both companies that had underbid plaintiff-corporation, and its bid for the first issue it would produce was higher than plaintiff-corporation's per-issue bid.

The lawsuit itself was a direct result of defendant's breach of its covenant not to compete, which was breached after defendant contacted Roy Reiman and was told that plaintiff-corporation would bring suit if a bid were made for the *Landhandler*. There is sufficient credible evidence in the record to support the jury verdict that defendant's conduct in breaching its covenant not to compete was a substantial factor in causing plaintiffs' damages.

## DAMAGES

Defendant contends that the evidence presented to the jury was insufficient to support an award for future lost profits. The jury awarded damages of $176,102.19.

While an award for future profits must be estimated with reasonable certainty, *Schubert v. Midwest Broadcasting Co.*, 1 Wis.2d 497, 502, 85 N.W.2d 449, 452 (1957) (quoting Restatement of Contracts §331(1) (1932)),

it is not necessary that the jury should arrive at a conclusion with mathematical certainty. The rule which permits a jury to determine future profits does not require them to arrive at a determination which may be mathematically sustained. In the very nature of things such profits cannot be definitely ascertained or determined. *Buxbaum v. G.H.P. Cigar Co.,* 188 Wis. 389, 393, 206 N.W. 59, 61 (1925).

There was sufficient evidence before the jury from which it could estimate damages to the requisite degree of certainty. There was evidence before the jury that plaintiff-corporation's gross income in 1978 from three issues of the *Landhandler* was $108,000, and that its 1978 expenses for the *Landhandler* totaled $69,521.95.[13] While cross-examination showed that the gross income figure included $7,000 from the sale of stories to Allis-Chalmers for use in the fourth 1978 issue of the *Landhandler,* the jury could easily subtract this amount from $108,000 and still have credible evidence before it that plaintiff-corporation's gross income figure for three issues of the *Landhandler* exceeded $100,000.

Using this gross income figure and the $69,521.95 expense figure, plaintiff-corporation derived a net profit of between thirty and forty thousand dollars from production of three issues of the *Landhandler,* or approximately $13,000 per issue. Evidence of prior profits in the same business may be used by the jury in computing loss of future profits. *Buxbaum, supra,* 188 Wis. 389, 393, 206 N.W. 59, 61 (1925); Wis J I—Civil 3725. The $176,102.19 damage award reflects profits from between thirteen and fourteen future issues, less than four more

---

[13] While it appears that the $69,521.95 expense figure was based in part on underlying figures which the trial court ruled inadmissible, defendants at no time objected to introduction of the total expense figure, failed to make a motion to strike when the underlying figures were ruled inadmissible, and raised no objection to use of this figure in plaintiffs' closing argument.

years of production. The jury had before it credible evidence that although production of the *Landhandler* was awarded on an issue-by-issue basis, plaintiff-corporation had produced it for eight consecutive years until defendant's breach. There was sufficient credible evidence for the jury to conclude that but for defendant's breach, plaintiff-corporation would have produced the *Landhandler* for three to four more years.

Defendant argues that because the $69,521.95 expense figure was determined using the cash basis, expense figures for 1978 do not reflect additional amounts expended in 1977 for production of the three 1978 issues generating the gross income figure. While this may be true, any resulting error is more than offset by items included in expenses which arguably should have been excluded. The costs for generating the $7,000 in stories sold to Allis-Chalmers were paid in 1978 and included in the 1978 expense figure. If the $7,000 is excluded from gross income, the costs of generating that income should be excluded from expenses. Additionally, the record reflects that the expense figure included an amount for overhead, although the exact amount was not proven at trial. This amount was also arguably excludable from expenses, as there was sufficient evidence to establish that plaintiff-corporation would have sustained the same overhead expenses with or without the *Landhandler*. *See Schubert, supra,* 1 Wis.2d at 503–04, 85 N.W.2d at 452–53. Defendant-corporation cannot be heard to complain that the expense figure was too low:

[T]here are cases in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, while at the same time it is of such a character that the amount in money is incapable of proof. In these cases the defendant usually has reason to foresee this difficulty of proof and should not be allowed to profit

by it.[14] In such cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court. Comment a to Restatement of Contracts §331 (1932).

Plaintiffs cross-appeal from the trial court's exercise of this "usual supervisory power," which occurred when it ordered a new trial on damages unless plaintiffs agreed to accept a reduced award.

A trial court finding that a jury award is excessive will be overturned only for an abuse of discretion. The test to determine abuse is whether, if the trial court had been sitting as the sole finder of fact and had fixed the plaintiff's damages in the disputed amount, this court would still disturb the finding. If there is a reasonable basis for the trial court's determination as to the proper amount, it will be sustained. *Lutz v. Shelby Mutual Insurance Co.*, 70 Wis.2d 743, 759, 235 N.W.2d 426, 435 (1975) (footnotes omitted).

In affirming the reduction of damages, not only are we aided by the trial court's analysis of the evidence and appraisal of the award, but we also note that plaintiff-Reiman testified that the industry value of a publication for sale purposes is ten times its net earnings. The reduced award is in excess of ten times the maximum net profit figure that could be determined from the evidence presented by plaintiffs. There is a reasonable basis for the reduced award, which clearly is "within the range of a reasonably debatable amount."[15] *Kobelinski*

---

[14] *Accord, Novo Indus. Corp. v. Nissen*, 30 Wis.2d 123, 133, 140 N.W.2d 280, 285 (1966); *Schubert v. Midwest Broadcasting Co.*, 1 Wis.2d 497, 503, 85 N.W.2d 449, 452 (1957).

[15] Plaintiffs rely on *Treat v. Hiles*, 81 Wis. 280, 289–90, 50 N.W. 896, 899 (1892), for their argument that the reduction usurped the jury's determination on how long plaintiff-corporation might have retained production of the *Landhandler*. While we agree that duration of the period for which damages are recoverable is a question of fact for the trier of fact, modern cases usually

*v. Milwaukee & Suburban Transport Corp.*, 56 Wis.2d 504, 525, 202 N.W.2d 415, 427 (1972). *Accord, Cords v. Anderson,* 80 Wis.2d 525, 553, 259 N.W.2d 672, 685 (1977).

*By the Court.*—Judgment affirmed.

benefit from projections based on expert testimony. Plaintiffs offered none in this case where it is undisputed that production of the *Landhandler* was awarded on an issue-by-issue basis.

