GTC AUTO PARTS and American Mutual Insurance Co.,
Plaintiffs-Appellants-Petitioners,

v.

LABOR & INDUSTRY REVIEW COMMISSION and James S.
Bartosh, Defendants-Respondents.

Supreme Court

*No. 92–3184. Oral argument April 27, 1994.—Decided June 7,
1994.*

(Also reported in 516 N.W.2d 393.)

For plaintiffs-appellants-petitioners there were briefs by *Michael C. Frohman,* and *Kasdorf, Lewis & Swietlik, S.C.,* Milwaukee and oral argument by *Michael C. Frohman.*

For the defendant-respondent (LIRC) the cause was argued by *Stephen M. Sobota,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

For the defendant-respondent (Bartosh) there was a brief by *Thomas A. Siedow* and *Carroll, Parroni, Postlewaite, Graham, Siedow & Jackson, S.C.,* Eau Claire and oral argument by *Thomas A. Siedow.*

Amicus curiae brief was filed by *Joseph P. Danas, Jr.* and *J. Patrick Condon* and *Borgelt, Powell, Peterson & Frauen, S.C.* for Wisconsin Insurance Alliance and Wisconsin Manufacturers and Commerce.

STEINMETZ, J.   This case presents one issue for review: Does the Labor & Industry Review Commission (LIRC) have the authority to order an employer to pay temporary total disability (TTD) benefits indefinitely to an injured employee without regard to the employee's medical condition? We hold that LIRC does not have this authority. Therefore, we reverse the decision of the court of appeals and remand the cause to the circuit court. We direct the circuit court to order LIRC to hold a hearing consistent with this opinion.

This appeal requires us to review an order made by LIRC. Section 102.23(1)(a), Stats., provides that when a court reviews such an order, "[t]he findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive." There is no allegation of fraud in this case. Hence, we accept the following facts found by LIRC as conclusive.[1]

James S. Bartosh sustained a back injury on April 28, 1988, while in the course of his employment with

---

[1] A hearing examiner from the Department of Industry, Labor and Human Relations (DILHR) issued the initial findings of fact along with an interlocutory order in this case. On review, LIRC adopted the hearing examiner's findings and order as its own. Hence, we accept the hearing examiner's findings as conclusive.

GTC Auto Parts (GTC) as an automobile mechanic. Following the accident, he was able to continue working for a period of time. His condition soon deteriorated to the point that he sought medical attention. Dr. Thomas Rieser determined that Bartosh had sustained a herniated disc at the L4–5 level. Bartosh's back did not respond to conservative care. As a result, Dr. Rieser performed surgery on Bartosh on August 10, 1988. While the surgery did relieve the pain in Bartosh's right leg, it was, for the most part, unsuccessful. Following the surgery, Bartosh's low back pain became progressively worse.

In October, 1988, Dr. Rieser concluded that Bartosh would not be able to return to work as an automotive mechanic. Dr. Rieser anticipated at that time that Bartosh would have a lifting restriction of approximately 30 pounds, with no repetitive lifting or bending. The pain continued to increase in Bartosh's low back. By late October, 1988, he was unable to do the exercises recommended by his physical therapist; and by mid-December of that year he was having difficulty sitting and standing. At about this time, Bartosh began a conditioning or work-hardening program.

Following an examination on March 10, 1989, Dr. Rieser concluded that Bartosh had plateaued in his recovery and had permanent partial disability of 22 percent of the body as a whole. Dr. Rieser felt that additional surgery was not required at that time. Bartosh sought a second opinion. Dr. Boachie-Adjei, from the University of Minnesota Hospital's Low Back Center, recommended that Bartosh undergo immediate surgery involving a three-level fusion for lumbar spondylosis. After considering both opinions, Bartosh decided that because his pain was tolerable he would not undergo further surgery.

In September, 1988, GTC's insurance carrier, American Mutual Insurance Company (American Mutual),[2] hired a vocational consultant to help Bartosh find a suitable job. After Bartosh had unsuccessfully searched for a job for 60 days, the consultant recommended that Bartosh explore retraining to enhance his job skills and employment options. In late July and early August of 1989, Bartosh underwent a three-day vocational evaluation at the University of Wisconsin-Stout. The report from this evaluation indicated that Bartosh had three options—immediate employment, various forms of retraining and self-employment.

American Mutual was "not interested in funding the applicant's retraining." In addition, Bartosh expressed no interest in retraining and preferred to pursue self-employment. Accordingly, he sought assistance from the Department of Vocational Rehabilitation (DVR) to establish himself in the field of cabinet and furniture-making—an occupation with which he had previous experience. At first, he worked at this job three or four hours a day, four days a week.

When he experienced severe back and leg pain, even after reducing his work hours, he returned to Dr. Rieser for an examination. An MRI revealed no essential change in Bartosh's anatomical condition. In a letter sent to American Mutual on October 11, 1990, Dr. Rieser stated: "Based on the risks of surgery and the fact it would not necessarily guarantee his ability

---

[2] Both GTC and its insurer, American Mutual, are responsible for paying for Bartosh's various benefits under the Worker's Compensation Act. However, American Mutual is most likely paying the bills. Hence, for the sake of simplicity, this opinion will refer only to American Mutual when discussing the payment of benefits.

to work, I feel at this time I would consider him [Bartosh] totally disabled insofar as I do not feel he can continue to carry on gainful employment."

Bartosh requested a hearing to determine what disability benefits American Mutual owed him. At the time of his accident, Bartosh was earning $500 per week from GTC. Pursuant to sec. 102.43(1), Stats.,[3] American Mutual paid Bartosh weekly TTD benefits of $333.33 from the time of his accident until March 10, 1989, when Dr. Rieser determined that Bartosh had plateaued in his recovery. American Mutual continued paying him benefits at this TTD rate until December 31, 1989. After that, the insurer began paying him $117 a week as permanent partial disability (PPD) benefits.

At the hearing, held on December 5, 1990, a DILHR hearing examiner found that Bartosh had been physically unable to work since at least June 1, 1990. His findings of fact stated: "If both the applicant's physical condition and the training he possesses remain unchanged, he will be permanently and totally disabled. However, neither he, nor for that matter the respondent [American Mutual], has established that the present status quo is permanent. . . . Should he elect not to have the three-level fusion [surgery] and should the respondent choose not to fund the vocational retraining . . . then the applicant will remain totally disabled and benefits will be due accordingly." The hearing examiner ordered American Mutual to pay Bartosh benefits at the TTD rate of $289.66 "until either the death of the applicant, or an order from the department to the contrary." The hearing examiner

---

[3] Section 102.43(1), Stats., provides as follows:

(1) If the injury causes total disability, two-thirds of the average weekly earnings during such disability.

also directed DILHR not to make an order to the contrary unless Bartosh decided to undergo surgery or American Mutual offered to fund Bartosh's retraining.[4]

GTC and American Mutual filed a petition requesting that LIRC review the order of the DILHR hearing examiner. By order dated April 30, 1992, LIRC affirmed the hearing examiner's findings and order. LIRC interpreted the order as "granting applicant *temporary* total disability benefits (TTD) after June 1, 1990, for an indefinite period until the death of the applicant or an order from the Department to the contrary."

GTC and American Mutual then sought judicial review of LIRC's order pursuant to sec. 102.23, Stats. The circuit court for Pierce county, the Honorable Robert W. Wing, affirmed LIRC's order. The court held that LIRC had the authority to order American Mutual to pay Bartosh TTD benefits indefinitely, without regard to his medical condition. The court of appeals affirmed the order of the circuit court.

GTC and American Mutual petitioned for a review of the court of appeals' decision. We accepted this peti-

___

[4] At the hearing, American Mutual claimed that it had overpaid Bartosh from March 10, 1989 to December 4, 1989. The hearing examiner found that there was no overpayment during this period. He also found that American Mutual had paid Bartosh at a higher rate than necessary from December 4, 1989 to December 31, 1989. Accordingly, he factored this overpayment into his order. The parties neither briefed nor argued the issue of overpayment before this court. Hence, we will not address it further and this opinion in no way affects LIRC's order as it concerns the issue of overpayment. *See Reiman Associates v. R/A Advertising,* 102 Wis. 2d 305, 306, n.1, 306 N.W.2d 292 (Ct. App. 1981).

tion and now reverse the decision of the court of appeals. We remand the cause to the circuit court and direct that court to order LIRC to hold a hearing consistent with this opinion.

This review requires us to examine LIRC's authority to order an employer to pay disability benefits to an injured employee. LIRC "has only such authority as is granted by statute." *Levy v. Industrial Comm.*, 234 Wis. 670, 675, 291 N.W. 807 (1940). LIRC derives its authority to order the payment of temporary disability benefits from sec. 102.43, Stats.,[5] and permanent disa-

---

[5] Section 102.43, Stats., provides in relevant part:

**102.43 Weekly compensation schedule.** If the injury causes disability, an indemnity shall be due as wages commencing the 4th calendar day from the commencement of the day the scheduled work shift began, exclusive of Sundays only, excepting where the employe works on Sunday, after the employe leaves work as the result of the injury, and shall be payable weekly thereafter, during such disability. If the disability exists after 7 calendar days from the date the employe leaves work as a result of the injury and only if it so exists, indemnity shall also be due and payable for the first 3 calendar days, exclusive of Sundays only, excepting where the employe works on Sunday. Said weekly indemnity shall be as follows:

. . ..

(5) Temporary disability, during which compensation shall be payable for loss of earnings, shall include such period as may be reasonably required for training in the use of artificial members and appliances, and shall include such period as the employe may be receiving instruction pursuant to s. 102.61. Temporary disability on account of receiving instruction of the latter nature, and not otherwise resulting from the injury, shall not be in excess of 40 weeks. Such 40-week limitation does not apply to temporary disability or travel or maintenance expense under s. 102.61 if the department determines that additional training is warranted. The necessity for additional training as authorized by the department for any employe shall be subject to periodic review and reevaluation.

(6) (a) Except as provided in par. (b), no sick leave benefits provided in connection with other employment or wages received

bility benefits from sec. 102.44.[6] Temporary disability benefits compensate injured employees for lost wages

from other employment held by the employe when the injury occurred may be considered in computing actual wage loss from the employer in whose employ the employe sustained injury.

(b) Wages received from other employment held by the employe when the injury occurred shall be considered in computing actual wage loss from the employer in whose employ the employe sustained the injury, if the employe's weekly temporary disability benefits are calculated under s. 102.11 (1) (a).

(c) Wages received from the employer in whose employ the employe sustained injury or from other employment obtained after the injury occurred shall be considered in computing benefits for temporary disability.

(7) (a) If an employe has a renewed period of temporary disability commencing more than 2 years after the date of injury and, except as provided in par. (b), the employe returned to work for at least 10 days preceding the renewed period of disability, payment of compensation for the new period of disability shall be made as provided in par. (c).

(b) An employe need not return to work at least 10 days preceding a renewed period of temporary disability to obtain benefits under sub. (5) for rehabilitative training commenced more than 2 years after the date of injury. Benefits for rehabilitative training shall be made as provided in par. (c).

(c) 1. If the employe was entitled to maximum weekly benefits at the time of injury, payment for the renewed temporary disability or the rehabilitative training shall be at the maximum rate in effect at the commencement of the new period.

[6] Section 102.44, Stats., provides in relevant part:

(1) Notwithstanding any other provision of this chapter, every employe who is receiving compensation under this chapter for permanent total disability or continuous temporary total disability more than 24 months after the date of injury resulting from an injury which occurred prior to January 1, 1976, shall receive supplemental benefits which shall be payable in the first instance by the employer or the employer's insurance carrier, or in the case of benefits payable to an employe under s. 102.66, shall be paid by the department out of the fund created under s. 102.65. These supplemental benefits shall be paid only for weeks of disability occurring after January 1, 1978, and shall continue during the period of such total disability subsequent to that date.

while they recover from their injuries. *See* sec. 102.43. Permanent disability benefits compensate injured employees for lifelong impairment of bodily function and lost earning capacity. *See* sec. 102.44.

LIRC has ordered American Mutual to pay Bartosh TTD benefits until his death or until DILHR makes an order to the contrary. To determine if LIRC

(a) If such employe is receiving the maximum weekly benefits in effect at the time of the injury, the supplemental benefit shall be an amount which, when added to the regular benefit established for the case, shall equal $125.

(b) If such employe is receiving a weekly benefit which is less than the maximum benefit which was in effect on the date of the injury, the supplemental benefit shall be an amount sufficient to bring the total weekly benefits to the same proportion of $125 as the employe's weekly benefit bears to the maximum in effect on the date of injury.

(c) The employer or insurance carrier paying the supplemental benefits required under this subsection shall be entitled to reimbursement for each such case from the fund established by s. 102.65, commencing one year from the date of the first such payment and annually thereafter while such payments continue. Claims for such reimbursement shall be approved by the department.

(2) In case of permanent total disability aggregate indemnity shall be weekly indemnity for the period that the employe may live. Total impairment for industrial use of both eyes, or the loss of both arms at or near the shoulder, or of both legs at or near the hip, or of one arm at the shoulder and one leg at the hip, constitutes permanent total disability. This enumeration is not exclusive, but in other cases the department shall find the facts.

(3) For permanent partial disability not covered by ss. 102.52 to 102.56, the aggregate number of weeks of indemnity shall bear such relation to 1,000 weeks as the nature of the injury bears to one causing permanent total disability and shall be payable at the rate of two-thirds of the average weekly earnings of the employe, the earnings to be computed as provided in s. 102.11. The weekly indemnity shall be in addition to compensation for the healing period and shall be for the period that the employe may live, not to exceed 1,000 weeks.

has the authority to make this order, we must interpret sec. 102.43, Stats., the temporary disability benefit statute. The interpretation of a statute is a question of law that courts generally review de novo. *Lisney v. LIRC,* 171 Wis. 2d 499, 505, 493 N.W.2d 14 (1992). "Courts, however, frequently refrain from substituting their interpretation of a statute for that of the agency charged with the administration of a law." *Id.* LIRC's experience, competence and specialized knowledge regarding the Worker's Compensation Act would ordinarily entitle its interpretation to great weight. *See Jicha v. DILHR,* 169 Wis. 2d 284, 290, 485 N.W.2d 256 (1992). We find, however, that in this case LIRC's interpretation of the relevant statutes "directly contravenes the words of the statute [and] is clearly contrary to legislative intent. . . ." *See Lisney,* 171 Wis. 2d at 506; *see also* sec. 102.23(1)(e). Therefore, we owe no deference to LIRC's interpretation of sec. 102.43. *Lisney,* 171 Wis. 2d at 506.

"The objective in construing a statute is to discern the intent of the legislature . . . and the primary source to be used is the language of the statute itself." *State v. Eichman,* 155 Wis. 2d 552, 560, 456 N.W.2d 143 (1990). Section 102.43, Stats., provides that TTD benefits "shall be due as wages . . . after the employe leaves work as the result of the injury, and shall be payable weekly thereafter, during such disability." This period, during which an employer is obligated to pay TTD benefits, is referred to as the healing period. *See, e.g., Valadzic v. Briggs & Stratton Corp.,* 92 Wis. 2d 583, 286 N.W.2d 540 (1979).

"The healing period is understood to mean, and is generally construed by the Industrial Commission as meaning, the period prior to the time when the condition becomes stationary . . . . The interval may continue

until the employee is restored so far as the permanent character of his injuries will permit." *Knobbe v. Industrial Comm.*, 208 Wis 185, 189–90, 242 N.W. 501 (1932). In this case, Bartosh's recovery plateaued or became stationary, according to Dr. Rieser, by no later than March 10, 1989. American Mutual has already paid Bartosh TTD benefits for this period.

LIRC and both lower courts concluded that Dr. Rieser's determination, that Bartosh's recovery had plateaued, did not signal the end of the healing period because Bartosh's condition could still improve if he chose to undergo surgery or if American Mutual chose to fund his retraining. We disagree with this conclusion.

■

Bartosh chose not to undergo further surgery. If he were to undergo surgery in the future, he might enter a renewed period of temporary disability. *See* sec. 102.43(7), Stats. At the time of the hearing, however, his condition was stationary. This court has made it clear that LIRC does not have the authority to order an employer to pay an injured employee TTD benefits for the period after the employee's medical condition has stabilized and before the employee undergoes surgery. *Larsen Co. v. Industrial Comm.*, 9 Wis. 2d 386, 393, 101 N.W.2d 129 (1960) ("there is nothing in sec. 102.43, Stats., which authorizes the commission to continue awarding temporary total disability until such time as it is possible to accurately measure the maximum amount of permanent partial disability that may occur at some future time").

The logic of *Larsen* applies to retraining as well. It is certainly possible that Bartosh's medical condition may improve as a result of retraining. This court acknowledged as much in *Transamerica Ins. Co. v.*

*ILHR Department,* 54 Wis. 2d 272, 280, 195 N.W.2d 656 (1972):

> Times have changed since these early decisions, but, among the changes that time has brought is a broader definition of the terms "medical" and "surgical." The doctor does more than prescribe medicines; the surgeon does more than make an incision. To aid the full recovery of the patient, either or both may find required and recommend a routine of appropriate muscle-building exercises or physical therapy treatments or even *vocational rehabilitation training.* Such ancillary aids, in some situations, may be as important to full recovery as pills prescribed or operations performed. (Emphasis added.)

In this case, however, after Bartosh underwent the vocational evaluation at the University of Wisconsin-Stout, he chose to pursue self-employment as a cabinet and furniture-maker rather than to pursue retraining. If Bartosh were to enter a retraining program in the future, he might enter a renewed period of temporary disability. *See* sec. 102.43(5) and (7), Stats. However, between the time that his condition plateaued and the time he enters such a program, LIRC does not have the authority to order American Mutual to pay Bartosh any TTD benefits. Furthermore, if Bartosh were to pursue a program of retraining, American Mutual would not be responsible to pay for the retraining itself.

LIRC's order requires American Mutual to pay Bartosh TTD benefits indefinitely or until Bartosh is retrained. In essence, this order forces American Mutual to fund Bartosh's retraining. LIRC does not have the authority to do this. According to section 102.61(3), Stats., "[n]othing in this section *prevents* an employer or insurance carrier from providing an

employe with the services of a private rehabilitation provider . . .." (Emphasis added.) While this statute certainly permits an employer to fund retraining, it does not require that the employer do so. No other statutory provision gives LIRC the authority to force an employer to pay for retraining. LIRC cannot avoid its statutory limitations by making an order that puts the employer between a rock—paying the employee TTD benefits indefinitely—and a hard place—funding the employee's retraining.

Based on the above analysis, we hold that LIRC does not have the authority pursuant to sec. 102.43, Stats., to order an employer to pay TTD benefits indefinitely without regard to the employee's medical condition. To the contrary, LIRC may only order an employer to pay TTD benefits to an injured employee during the healing period. Here, Bartosh's healing period ended no later than March 10, 1989, when his doctor determined that his condition had "plateaued." Bartosh chose not to undergo further surgery. He further chose to pursue self-employment, rather than retraining, when the DVR offered both options. Hence, American Mutual's obligation to pay Bartosh TTD benefits ended on March 10, 1989. LIRC does not have the authority to force American Mutual to continue to pay TTD benefits beyond that date, given Bartosh's medical condition.

We reverse the decision of the court of appeals and remand the cause to the circuit court. We direct the circuit court, on remand, to order LIRC to hold a hearing to determine the level of Bartosh's permanent disability and the corresponding permanent disability

benefits that American Mutual must pay pursuant to sec. 102.44, Stats.[7]

*By the Court.*—The decision of the court of appeals is reversed and remanded.

---

[7] Bartosh asks this court to convert LIRC's order regarding temporary disability benefits into an order requiring American Mutual to pay Bartosh permanent total disability benefits. We decline to do so. It is LIRC's responsibility to make the requisite findings and order regarding the nature of Bartosh's permanent disability. LIRC has not yet done so in this case. Therefore, we remand the cause to the circuit court with the direction to order LIRC to make the appropriate findings and order.