James R. PEMBERTON and Grace M. Pemberton, Appellees,

v.

OvaTECH, INC., a Wisconsin corporation; Harold Morrow, Dr. M. L. Fahning, Appellant.

James R. PEMBERTON and Grace M. Pemberton, Appellees,

v.

OvaTECH, INC., a Wisconsin corporation, Appellant.

Dr. M. L. Fahning; Harold Morrow.

Nos. 81–1024, 81–1049.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 17, 1981.

Decided Jan. 13, 1982.

Robert S. Cragg, Minneapolis, Minn., for Dr. M. L. Fahning.

Christopher J. Dietzen, argued, for Larkin, Hoffman, Daly & Lindgren, Ltd., Minneapolis, Minn., for appellees.

Before HEANEY, HENLEY and ARNOLD, Circuit Judges.

HENLEY, Circuit Judge.

In these consolidated appeals, Dr. M. L. Fahning, a Wisconsin resident and the President of appellant OvaTech, Inc., appeals from an adverse judgment of the district court, entered after a jury trial, finding him liable for $25,500.00 for negligence.[1] OvaTech, a Wisconsin corporation, likewise appeals a $34,000.00 judgment[2] against it for breach of contract.[3] We affirm in part but order remittitur.

On November 15, 1977 appellees James and Grace Pemberton, operators of Pembrook Lane, a dairy farm in Minnesota,[4]

---

1. Plaintiffs-appellees James and Grace Pemberton consented to a remittitur of the initial jury award of $31,500.00.

2. The jury assessed damages for the breach at $42,000.00. This amount was subsequently reduced by remittitur. As a result of the reduction of the judgment, the total amount of recovery from the defendants was limited to $38,-000.00. (Appellees recovered the additional $4,000.00 on a trespass claim against Harold Morrow, the Secretary-Treasurer of OvaTech. This award, however, is not before the court at this time.)

3. OvaTech has adopted Dr. Fahning's brief on appeal.

4. The Pembertons purchased their 163 acre farm in 1969. At that time there were fortynine holstein cattle on the farm, only three or four of which were registered by the Holstein-Friesian Association of America, a Brattleboro, Vermont breed organization that inspects, classifies, and registers the holstein cattle of participating dairy farmers and keeps records on milk production capacity and favorable hereditary traits to enable farmers to determine which matings will be likely to produce offspring capable of yielding more milk and of transmitting this and other favorable characteristics. Appellees' income for the past eleven years has been principally derived from milk sales. With the ultimate goal of augmenting their income by selling breeding stock, appel-

entered into a contract with OvaTech in Wisconsin for the "superovulation" and "breeding back"[5] of one of their cows, Girard's Shady Brook Arlinda (Linda), which had a history of breeding problems. At that time Mrs. Pemberton left Linda at OvaTech's facility, where the services would be rendered. Pursuant to the contractual requirement that the cow's owners provide the semen necessary for these processes, the Pembertons selected the semen of a bull named Wayne Spring Fond Apollo (Wayne Spring) for superovulation. In early December appellees ordered three ampules of Barrett Ranch Ivan Rockman (Barrett Ranch) semen from Midwest Breeders Cooperative of Wisconsin for direct shipment by bus to OvaTech for Linda's breeding back. Mrs. Pemberton testified that in a mid-December telephone conversation with Dr. Fahning, he agreed to use the semen for this purpose.[6] She also stated that OvaTech confirmed delivery of the Barrett Ranch semen in a December 18 telephone conversation.

After Dr. Fahning's initial unsuccessful attempt to breed Linda, Mrs. Pemberton learned that Wayne Spring was a possible transmitter of mule-foot, a genetically linked defect in which the animal's hoof is solid rather than cleft. As a result of this discovery, she telephoned Dr. Fahning on January 26, 1978 to instruct him to discontinue using the Wayne Spring semen and substitute Barrett Ranch semen for the superovulation process.[7] Although Dr. Fahning agreed to this oral modification of the contract, he never used Barrett Ranch semen for this purpose.

In May, 1978, after further unsuccessful attempts to inseminate Linda with Wayne Spring semen, Dr. Fahning successfully inseminated her with Sapa Ska Ruler Rockman (Sapa Ska) semen. This semen had been delivered to OvaTech on December 30, 1977 by Ronald W. Hauglie, a fellow holstein breeder. Appellees had intended that it be used to inseminate another of their cows, Kyra, which Hauglie had delivered to OvaTech with a note of instructions from Mrs. Pemberton on the same date. The note, written by Mrs. Pemberton to Hauglie, stated:

lees have increased the number of registered holsteins they own. At trial, Mrs. Pemberton testified that she and her husband owned 70 to 75 holsteins, all but four of which were registered as purebred cattle.

5. At trial, Dr. Fahning, a licensed veterinarian in both Minnesota and Wisconsin, explained the processes of superovulation and breeding back.

The objective of ova transfer, of which superovulation is a part, is to produce a number of offspring from an outstanding cow. Through the process of superovulation a number of . . . eggs are released from a cow at one time; whereas, normally in a cycle a cow would simply release one egg at a time. We administer hormones which stimulate her system to release a number of eggs. She is then inseminated . . . and about a week after she is inseminated the fertilized eggs are flushed or collected from her uterus.

\* \* \* \* \* \*

Once the . . . eggs are recovered from the cow, the material that is recovered is examined under the microscope to identify the eggs that are found to determine if they are indeed fertile and growing normally.

Those that are determined to be normally fertile are then transferred into what we refer to as recipient animals. These are simply animals that are well grown, can be of a variety of breeds. They make no genetic contribution to the offspring that they are going to be carrying. It is important that they be at the same stage of the cycle as the animal from which the egg was recovered.

. . . [T]he recipient animal . . . merely acts as an incubator or host for this developing embryo.

\* \* \* \* \* \*

In general, once an animal has been through the superovulation process and ova transfer, if the owner of the donor has obtained the [desired] number of offspring . . . then in general . . . [the] animal [will be] bred back . . . so that she will carry her own calf naturally.

6. Dr. Fahning testified that he had no recollection or record of picking up this semen at the bus depot, placing it in a storage tank, using it on cows owned by other customers, or locating it after concluding his dealings with the Pembertons.

7. When Barrett Ranch was substituted for Wayne Spring for superovulation, the Pembertons selected semen from Ransom Rail Pacemaker for Linda's breeding back.

Please leave at OvaTech the blood sample kit, health papers, and 3 ampules (or whatever Doc wants) of Sapa Ska Ruler Rockman #17H–244 which is in cannister 5.

Also please bring back one ampule of Wayne Spring Fond Apollo No. 7 H 191. We left 4 ampules there and if Doc thinks 3 would be enough for Linda, we need one here.

We'll leave our Barrett Ranch Ivan Rockman semen there to hopefully breed Linda herself back.

The heifer [Kyra] is due in heat this coming week and if he wants to try breeding her fine. . . .

Dr. Fahning testified that he knew that the reference to the blood sample kit related to Linda [8] and that the health papers were submitted for Kyra. On the basis of the reference to the Sapa Ska semen in the note's first paragraph and the references to Wayne Spring semen in the note as well as in the original contract, he concluded that he should use the remaining Wayne Spring semen followed by the Sapa Ska semen for Linda's superovulation.[9]

As a result of the superovulation, Dr. Fahning collected seven fertilized ova from Linda and transplanted them into seven recipient cows owned by OvaTech. After the Pembertons learned that the recipient cows were pregnant, they entered into three separate contracts for the sale of three of Linda's offspring. Appellees en-

tered into a bull stud contract with Select Sires, a bull stud organization,[10] for the sale of one first choice bull calf for $2,000.00. They also contracted to sell one bull calf to Minnesota Valley Breeders Cooperative, another bull stud organization, for $1,500.00. The third contract was for the sale of a female embryo for $1,400.00 to Chuck Will, a holstein breeder. At the time these contracts were executed, it is clear that all the parties contemplated that the offspring that were the subjects of the contracts would be those of the Pembertons' cow Linda and the Barrett Ranch bull.

On February 9, 1979 Mrs. Pemberton and her son David went to OvaTech to pick up four of the recipient cows and discovered that Dr. Fahning had used the incorrect semen to inseminate Linda. Before leaving, Mrs. Pemberton asked Dr. Fahning to examine his records to determine if they might contain erroneous information on the semen used. When she and her son returned the following day to pick up the three remaining cows, Dr. Fahning confirmed that he had used the Sapa Ska instead of the Barrett Ranch semen to breed Linda.

Mrs. Pemberton paid her account by check on February 9. After she ascertained that Dr. Fahning had not used the Barrett Ranch semen, she stopped payment on the check. On February 28, Harold Morrow, the Secretary-Treasurer of OvaTech, went to the Pembertons' farm and attempted to

8. A blood sample was required only for cows undergoing superovulation and subsequent ova transfer. Here, only Linda underwent this process. The cow Kyra was delivered to OvaTech only for insemination.

9. On the basis of Mrs. Pemberton's note, the jury assessed twenty-five percent of the fault against appellees.

10. H. John Meyer, a holstein consultant for the Holstein Association, testified that a bull stud contract is an agreement between an artificial insemination organization (a bull stud organization) and a farmer for the sale of a bull calf that is the offspring of a specific cow and bull. Meyer also stated that the twenty-five to thirty

bull stud organizations that exist in the United States will lease or buy bulls from farmers to "prove," i.e., establish, their production potential. In proving a bull, the female offspring of the bull are evaluated for milk production capacity and certain other characteristics. A cow with a high milk yield and an ability to consistently transmit this and other favorable traits will substantially increase the value of her sire. If the bull has an above breed average production proof that is significant enough to create a demand in the dairy business, the bull stud organization will market the bull's semen.

repossess the seven recipient cows. He had loaded some of the cows onto his truck when an investigator from the sheriff's office arrived and ordered him to unload the cows. Morrow complied with this order.

By March 1, 1979 all the recipient cows had calved,[11] producing four bulls and three heifers. Upon learning that these calves were not the offspring of Linda and Barrett Ranch, Select Sires, Minnesota Valley Breeders, and Chuck Will cancelled their contracts with the Pembertons. Appellees sold the four bull calves as beef cattle for a total of about $1,300.00 and kept the three heifers.

Besides producing expert testimony on the difference in value between calves sired by Barrett Ranch and those sired by Sapa Ska, appellees adduced evidence that they had suffered a loss of business reputation. H. John Meyer, see n. 10 supra, who described the Pembertons' operation as "a registered herd that is just moving into the marketing phase of breeding stock," testified that a bull stud organization that buys a bull from a farmer

> [does] a lot of advertising for you, which enhances the value of your cattle at home because you just get exposure through your prefix being spread around. The prefix is like a brand name, and every breeder has one that goes on the names of all his cattle. Theirs is Pembrook Lane. All their cattle are named Pembrook Lane so and so. And as your prefix becomes more valuable your cattle are better known and actually in time the cattle will bring more money just because they carry a prefix that's associated with better quality cattle.

Meyer also noted that besides losing genetic potential and pedigree value in their cattle, the Pembertons lost their contact with a bull syndicate[12] that had "a good track record of getting bulls proven." Based on his familiarity with the reputation of appellees' farm in Minnesota, he concluded that the Pembertons

> received damage to their reputation in respect to loss of their prefix being moved into bull books and exposure to more possible buyers. I would say that was their greatest loss.... I felt their reputation as breeders was impaired from progress because they did not have the opportunity to put these bulls in front of the many breeders that would have gained exposure to their prefix nationwide and would have had more buyers coming to their farmplace looking for breeding stock and also more interest in members of this cow family.

An objection to Meyer's testimony on the value of the Pembertons' reputation was sustained on the ground that there was no foundation to establish his expertise in valuing reputation.

Ronald Hauglie, who has had a registered holstein herd since 1955 or 1956, testified that a good reputation in the holstein cattle business is important and has value. He stated that it generally takes a long time[13] to develop contacts and obtain a contract with a bull stud organization, and that once a contract is obtained, "it becomes easier ... to sell an animal." Moreover, the witness corroborated Meyer's testimony that a bull stud contract enhances a farm's reputation through the extensive use of the farm's prefix in national industry publications. In this regard, Hauglie stated that the sale of a bull calf to a bull stud organization is the beginning of a national reputation "because every animal that leaves your farm carrying your prefix, whether the animal does

---

**11.** They were subsequently returned to Ova-Tech.

**12.** A bull syndicate is an association of dairy farmers who jointly own young bulls and who work together to prove their bulls' transmitting

abilities with respect to specific traits. See n. 10 supra.

**13.** The witness stated that it took twenty-four years to make his initial contact and acquire a contract with a bull stud organization.

well for another person and they advertise the animal, they are advertising for you." He noted that although it takes four or five years to obtain a production record on a bull, "[y]ou gain your reputation on the initial point of sale, because you have already reached that first pinnacle of selling a bull to a major [bull stud] organization, which just a very, very small percentage of people in the United States do." Hauglie concluded that the Pembertons' reputation in the holstein business had been damaged "very much" by losing the stud contracts.

Another expert witness, Edmond E. Fellers, a former program director for the Holstein-Friesian Association who at the time of trial was engaged in the private merchandising of holstein cattle and semen, testified that the market value of registered holsteins "is greatly determined by . . . your past experience, like how many bulls you have sold before to A. I. [artificial insemination (bull stud)] organizations, how well they know you . . . ." After noting that the market value of holstein cattle is largely based on a farm's reputation, Fellers stated that bull stud contracts enhance reputation and therefore have a "great effect" on value.

Mrs. Pemberton testified that appellees' ultimate goal was to establish a national reputation by obtaining bull stud contracts, which, she noted, would increase the value and marketability of their cattle. She acknowledged that before Linda's superovulation, appellees had not obtained any bull stud contracts. Her son David testified

that during the eleven year operation of their farm, the Pembertons had sold several breeding bulls to local dairy farmers. He added that shortly before trial, they had sold one bull outside the State of Minnesota, but had never sold any registered bulls outside the state before 1980. Mrs. Pemberton further testified that her farm enjoyed a reputation of selling high quality breeding stock in Minnesota and estimated that appellees had suffered $25,000.00 in damages to their business reputation.

On appeal Dr. Fahning and OvaTech assert the five following grounds for reversal: (1) lack of personal jurisdiction; (2) improper award of damages for loss of business reputation; (3) a bar to appellees' claims under the Uniform Commercial Code; (4) the lack of expert testimony to prove negligence; and (5) excessive damages. We address each of these grounds in turn.

*Personal jurisdiction.*

■ Appellants argue that the district court, by invoking one of the Minnesota long-arm statutes,[14] could not require them to defend in Minnesota since their only contacts with the forum state were a response to Mrs. Pemberton's telephone request for an advertising brochure describing Ova-Tech's services and occasional telephone progress reports on the Pembertons' cow Linda.[15]

In addressing the jurisdictional issue raised by appellants, the district court im-

---

14. The Minnesota long-arm statute at issue here, Minn.Stat. § 543.19, which is adopted by Federal Rules of Civil Procedure 4(e) and (f), provides in pertinent part:

Subdivision 1. As to a cause of action arising from any acts enumerated in this subdivision, a court of this state with jurisdiction of the subject matter may exercise personal jurisdiction over any foreign corporation or any non-resident individual . . . in the same manner as if it were a domestic corporation or he were a resident of this state. This section applies if, in person or through an agent, the foreign corporation or non-resident individual:

\* \* \* \* \* \*
(b) Transacts any business within the state, or
(c) Commits any act in Minnesota causing injury or property damage . . . .

15. Appellants timely asserted a lack of personal jurisdiction in their answers. Because they did not move to dismiss on this ground or pursue this defense in any way before or during trial, the district court found that the defense had been waived. Since we find that the district court did not lack personal jurisdiction, we do not decide whether appellants waived their jurisdictional defenses.

plicitly framed the question before it as whether service of process pursuant to section 543.19 of the Minnesota Statutes conformed with the requirements of the due process clause of the fourteenth amendment.[16] To resolve the question the court applied the five guidelines set forth in our decision in *Aftanese v. Economy Baler Co.*, 343 F.2d 187, 197 (8th Cir. 1965), which are the quantity of defendant's contacts with the forum state; the nature and quality of those contacts; the relationship between the cause of action and the contacts; the interest of the state in providing a forum for injured residents; and the convenience of the parties.

In both quantity and quality, appellants' contacts with Minnesota are rather substantial. Dr. Fahning testified that after receiving doctoral degrees in dairy husbandry and veterinary medicine from the University of Minnesota in 1964, he remained at the University, where he was a member of the faculty until 1972. At the time of trial, Dr. Fahning was a lecturer at the University's Veterinary College and actively encouraged his students to visit OvaTech's facilities to familiarize themselves with the processes of superovulation and ova transfer. In addition, Dr. Fahning testified that he was licensed to practice veterinary medicine in Minnesota, occasionally performed veterinary services within that state, and had customers located in Minnesota, including Ronald Hauglie, one of appellees' expert witnesses,[17] to whom he had provided OvaTech's services.

After appellees read about superovulation in holstein industry magazines with a national circulation and learned of OvaTech through an advertisement in one of these publications, Mrs. Pemberton contacted Dr. Fahning concerning Linda's breeding problems. In response, Dr. Fahning sent her a brochure describing OvaTech's services that, according to his testimony, is "sen[t] out to prospective clients," and included a blank copy of OvaTech's standard contract. After the agreement was executed, the parties had a number of telephone conversations concerning the Pembertons' cows Linda and Kyra. Some of these telephone contacts were initiated by appellees, and others by Dr. Fahning, who testified: "It's our normal procedure to be in contact with clients periodically as we work with the donor" (Linda, here). During one of these conversations, the original contract term providing for the use of Wayne Spring semen for Linda's superovulation was modified to provide for the use of Barrett Ranch semen. Dr. Fahning's last contacts with the Pembertons occurred on February 27, 1979, the evening before Harold Morrow attempted to repossess the seven recipient cows. In one of two telephone calls to the Pembertons that evening, appellant urged appellees to pay OvaTech's bill and ex-

16. We note that in interpreting the meaning of "transacting business" under section 543.19 subdivision 1(b), Minn.Stat. § 543.19 subd. 1(b), presumably invoked here with subdivision 1(c) of section 543.19 to acquire jurisdiction, the Supreme Court of Minnesota has stated:

In interpreting the meaning of 'transacting business' under § 543.19, this court has consistently held that our long-arm statute is intended to assert in personam jurisdiction over nonresidents to the maximum extent consistent with due process, and any contacts by nonresidents with this state that are extensive enough to satisfy due process requirements for exercise of personal jurisdiction are also sufficient to authorize the exercise of personal jurisdiction under the statute. [Citations omitted.] Where § 543.19,

subd. 1(b), is concerned, the statutory and constitutional requirements for exercise of personal jurisdiction are coextensive. The controlling issue is thus whether upon the particular facts of this case the nonresident appellants' contacts with this state are sufficient to justify assumption of personal jurisdiction over them in the courts of this state under the constitutional standards of due process of law . . . .

*Marquette National Bank v. Norris*, 270 N.W.2d 290, 294–95 (Minn.1978).

17. Hauglie testified that he had been an OvaTech customer since 1976 and that Dr. Fahning had last performed OvaTech-related services for him approximately one year before trial.

pressed a desire to resolve the situation. Later, he called again to inquire whether any of the recipient cows had calved.

The contacts in question are closely connected with the cause of action. The act of sending the OvaTech brochure and blank contract and the series of telephone calls directly relate to Linda's superovulation.

The factors of forum interest and convenience, considered of secondary importance, *Aftanese v. Economy Baler Co., supra*, 343 F.2d at 197, are not decisive on this record. We note, however, that although not overwhelmingly significant, Minnesota's interest in providing a forum for its injured residents was neither insignificant nor absent. Finally, appellants, who were from western Wisconsin, were not inconvenienced by being required to defend in Minnesota.

On the facts connected with the execution and performance of the contract alone, a serious question exists whether service of process under section 543.19, one of the Minnesota long-arm statutes, could withstand the rigors of the due process clause. *E.g., Iowa Electric Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301 (8th Cir. 1979), *cert. denied*, 445 U.S. 911, 100 S.Ct. 1090, 63 L.Ed.2d 327 (1980). *See also Thompson v. Ecological Science Corp.*, 421 F.2d 467 (8th Cir. 1970). In light of the other circumstances noted above and the trespass committed in Minnesota by Harold Morrow while acting on OvaTech's behalf, however, we conclude that the use of section 543.19 to obtain service on appellants did not violate federal due process requirements.

*Loss of reputation.*

The district court upheld an award of damages for loss of business reputation on the ground that they were foreseeable under the rule of *Hadley v. Baxendale*, 156 Eng.Rep. 145 (1854).[18] On the record before us, we cannot sustain in full this portion of the damage award.

■ First, it is clear that the claim for loss of business reputation was based largely on loss of *national* reputation in the holstein breeding industry as a result of the cancellation of the two contracts that appellees had obtained with bull stud organizations. All of appellees' expert witnesses and Mrs. Pemberton testified that by obtaining a bull stud contract, a breeder obtained national exposure through advertisements placed by the stud organization in national holstein magazines. It is equally clear from the evidence that appellees had not yet acquired a reputation of national scope at the time they sustained their loss. Before 1980 the Pembertons had never sold a bull outside the State of Minnesota. Additionally, they had never obtained a bull stud contract before Linda's superovulation. The evidence showed only that appellees had a good local reputation as breeders of high quality cattle.

We note that there is a dearth of cases addressing the question whether damages are recoverable for the loss of a reputation that does not actually exist at the time the alleged injury occurs. Assuming that such recovery is allowable under the law of the state that the district court in a diversity

---

**18.** *Hadley v. Baxendale* held that damages awarded for breach of contract must be "reasonably to be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it." *Reiman Associates, Inc. v. R/A Advertising, Inc.*, 102 Wis.2d 305, 306 N.W.2d 292, 300 (1981), *quoting, Hadley v. Baxendale*, 156 Eng.Rep. 145, 151 (1854). In finding that damages for loss of reputation were foreseeable, the district court stated: "Defendants knew of plaintiffs' plans for the offspring of Linda and were familiar with the holstein industry."

case must apply,[19] the evidence of injury here does not support the award.

▉ To warrant damages, the evidence must demonstrate that the party seeking to recover has sustained some injury and must establish sufficient data from which the jury could estimate the amount. *E.g., Plywood Oshkosh, Inc. v. Van's Realty & Construction of Appleton, Inc.*, 80 Wis.2d 26, 257 N.W.2d 847, 849 (1977). Although the claimant has the burden of proving to a reasonable certainty the fact and amount of his damage, he is not required to prove his loss with mathematical accuracy. *E.g., Plywood Oshkosh, Inc., supra*, 257 N.W.2d at 849. It is sufficient if the jury can estimate the damages with a reasonable degree of certainty. *E.g., Reiman Associates, Inc. v. R/A Advertising, Inc.*, 102 Wis.2d 305, 306 N.W.2d 292, 302 (1981).

▉ Despite the evidence in the instant case that the name of appellees' farm would have been included in advertisements placed in national holstein industry publications, there is little evidence to support a finding that appellees would necessarily have achieved a national reputation as a result of this advertising. The evidence showed that it takes four or five years to obtain a production record on a bull. Until this proving period has elapsed, any attempt to predict whether the bull will have an above breed average production record that is significant enough to create a demand for the bull's semen would largely be based on conjecture. Indeed, even if a bull demonstrates high production potential, it is clear that the bull may later fall from favor. The bull Wayne Spring, which at one time was rated very highly, fell into disfavor after it became generally known that he was a possible transmitter of mule-foot.

Conceding for the moment that mere inclusion of the name of appellees' farm in holstein magazine advertisements might be of some benefit as a first step, considering the period of time necessary to obtain a production record on a bull and the uncertainty about production potential during that time, it is rank speculation to say that advertisement of the farm name will be a substantial factor in appellees' achieving a national reputation as sellers of high quality breeding stock. At most, the evidence shows some speculative possibility of delay in achieving a national reputation and perhaps some damage to local reputation as a breeder.

▉ With respect to damages to local reputation, we have searched the record in vain for evidence upon which the jury could have estimated the amount of damages with a reasonable degree of certainty. *E.g., Reiman Associates, Inc. v. R/A Advertising, Inc., supra*, 306 N.W.2d at 302. While it is true that Mrs. Pemberton testified that appellees sustained $25,000.00 in damages to their business reputation, the record reveals no factual basis to support this estimate. Mrs. Pemberton merely concluded that appellees had been damaged to this extent without stating any of the facts underlying the damage estimate. Thus, her testimony is too uncertain to establish the amount of any loss sustained. *E.g., Plywood Oshkosh, Inc., supra*, 257 N.W.2d at 849. Other witnesses testified only that the Pembertons had been damaged but cited no specifics and gave no figures from which reasoned estimates could be made.

In light of appellees' failure to meet their burden of proving more than nominal damages on account of loss of business reputation, we order remittitur and hereby limit the award of damages to $11,150.00 for the

---

**19.** In a diversity case, the conflicts of laws rules of the forum state control which substantive law the district court must apply. *E.g., Jump v. Goldenhersh*, 619 F.2d 11 (8th Cir. 1980). We note that here, the contract between the Pembertons and OvaTech provided:

"This Agreement shall be governed by and construed in accordance with the laws of the State of Wisconsin ...." Thus, in the cause of action based on breach of contract, the district court was required to apply Wisconsin law.

negligence and breach of contract claims.[20] Our affirmance of the damage award is conditioned on appellees' consent to the remittitur. If within twenty days from and after issuance of mandate herein appellees shall in the district court remit all damages above the sum of $11,150.00 on the negligence and breach of contract claims, the judgment will stand affirmed as of date of the judgment from which appeal was taken with interest and costs in the district court as provided by law. In the absence of such remittitur the district court will vacate its judgment for damages on said claims and award a new trial on all issues.

After carefully considering appellants' arguments on the three remaining issues on appeal, we conclude that they are without merit.

In light of what has been said, the judgment of the district court conditionally is affirmed subject to remittitur of all damages beyond $11,150.00. In this court each party shall bear that party's own costs.

---

**20.** This figure is the highest amount that is supported by the evidence on the difference in market value between the calves sired by Sapa Ska and those that would have been sired by Barrett Ranch had the correct semen been used. The $11,150.00 figure does not include the $4,000.00 award on the trespass claim, and it is computed without regard to diminution on account of any contributory fault of appellees. *See* n.9, *supra.*

We note that appellants introduced evidence of the payments due them under the contract and the dishonor of the check presented as payment of the Pembertons' account. Dr. Fahning testified that as of the time of trial, no payment had been received for OvaTech's services. Appellants also mention appellees' failure to pay for the services provided by OvaTech in their brief. Because appellants did not seek to recover on a *quantum meruit* theory for the services rendered and offer any evidence on the actual value of those services, there is no basis in the record on which this court can order setoff of the value of the services rendered by appellants against the damages recovered by appellees.