In the Matter of Richard Herman BROWNSBERGER, Richie Hyman Brownsberger and Herbie Joe Brownsberger, Debtors.

CENTRAL COOPERATIVES, INC., Plaintiff,

v.

Richard Herman BROWNSBERGER, Richie Hyman Brownsberger and Herbie Joe Brownsberger, Defendants.

Bankruptcy Nos. 83–02953–SW, 83–02952–SW and 83–02954–SW.

Adv. Nos. 84–0139–SW, 84–0140–SW and 84–0141–SW.

United States Bankruptcy Court, W.D. Missouri, Southwestern Division.

Jan. 31, 1986.

Michael R. Roser, Ronald S. Weiss, Berman, Deleve, Kuchan & Chapman, Kansas City, Mo., Joseph A. Hamilton, Pleasant Hill, Mo., for plaintiff.

Nicholas L. Swischer, Nevada, Mo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT DISMISSING WITHOUT PREJUDICE THE WITHIN COMPLAINT FOR A DECREE OF NONDISCHARGEABILITY

DENNIS J. STEWART, Bankruptcy Judge.

These are adversary actions brought by a creditor who is the assignee of the Osage Production Credit Association, which loaned the defendants—a father and two sons involved together in farming and trucking operations—some $166,680.00 pursuant to a line of credit which the assignee now claims to have been granted in reliance on a false financial statement presented to Osage Production Credit Association. It is therefore contended that the indebtedness is nondischargeable under the provisions of § 523(a)(2) of the Bankruptcy Code, excepting fraudulenty-induced obligations from the discharge in bankruptcy. It is also contended by the plaintiff that the same liability should be declared nondischargeable under § 523(a)(6) of the Bankruptcy Code, which holds liabilities created by willful and malicious conversion to be nondischargeable.[1]

The defendants have pointed out in their pretrial responses to the complaints for

---

1. The allegations respecting the alleged violations of sections 523(a)(2) and 523(a)(6) in the respective complaints in the actions at bar are somewhat vague. The allegations with respect to section 523(a)(2) state that money was obtained through false statements and the elements of the statute are virtually all that are contained in those allegations. The allegation concerning section 523(a)(6) is even more cryptic: "Defendant caused willful and malicious injury by the sale and conversion of property in which plaintiff had a security interest." According to the clear letter of the complaint which was filed by the plaintiff, the allegations—both of fraud under section 523(a)(2) and of willful and malicious conversion under section 523(a)(6)—appertain to a single indebtedness of unstated magnitude. The prayer for relief is that "judgment be entered on behalf of plaintiff in the amount of *the* indebtedness" and that the same be declared nondischargeable in bankruptcy. (Emphasis supplied.) The evidence respecting the alleged willful and malicious conversion, however, upon which the plaintiff relies in its posttrial brief is to the effect that some $43,976.89 in proceeds of crop sales and crop insurance benefits for 1980, in which the plaintiff had a security interest, were converted by the debtors. If so, it seems that any separate indebtedness based upon conversion may have been discharged by the promissory note executed on November 30, 1981, in the amount of $88,488.23. In the "judgment entry" of the judgment obtained by the plaintiff on that note in the Circuit Court of Bates County on September 26, 1983, the circuit court recites that the note was executed "in discharge of an antecedent debt." If so, a novation may have occurred, discharging the prior existing indebtednesses. "In order to effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed. The intention of the obligor that the existing debt should be discharged by the new obligation must be concurred in by both debtor and creditor. The point in every case, then, is whether the parties intend by their arrangement to extinguish the old debt or obligation and rely entirely on the new, or whether they intend to keep the old alive and merely accept the new as further security, and this question of intention must be decided from all the circumstances. The existence of such an intention may of course be found, even though there is nothing positive in the agreement. In other words, the intention to substitute one contract for another so as to constitute a novation need not be expressed, but may be inferred from the circumstances. The issue of novation presents questions of fact if there is any conflicting evidence and if the terms of the agreement are equivocal or uncertain." 58 Am.Jur.2d *Novation* sec. 20, pp. 534, 535 (2d ed. 1971). Such evidence as exists on the issue in the action at bar is in conflict. While, as observed above, the state court judgment unequivocally recites that the promissory note of November 30, 1981, was intended to discharge the "antecedent debt," the plaintiff's state court petition in that same case had stated that the new promissory note of November 30, 1981, was "(i)n accord and satisfaction" of the foregoing indebtedness. If so, a novation may

relief that the plaintiff has previously sued the defendants in a Missouri state court, the Circuit Court of Bates County, on the same cause of action; that the suit in that action culminated in a money judgment for the plaintiff and against the defendants for the same amount which is sought in this action—$115,633.18—; that, in electing to sue on the contract between the parties, the plaintiff forewent its cause of action for fraud and cannot, therefore, elect to raise it in the bankruptcy action; that, further, the plaintiff earlier brought a suit for injunction[2] against the defendants; that the suit was dropped when the defendants issued a new note to the plaintiff for the amount then due to the plaintiff—$88,488.23—and granted the plaintiff a security interest in several tracts of real estate to secure the payment of that sum plus interest; and that "thereafter plaintiff neglected to protect [its] real estate lien interest [and] allowed said property to be sold at a foreclosure sale of the first deed of trust holder."[3] Because the pleadings thus summarized appeared to define issues of material fact for trial and determination,[4] the court attempted to set these actions for the trial of merits on several successive occasions commencing on October 24, 1984.[5] After the parties had achieved several continuances,[6] trial of the merits was

---

2. According to such evidence as has been made available in these actions, the suit for injunction was filed on September 10, 1981, in the Circuit Court of Bates County. See *Central Cooperatives, Inc. v. Brownsberger & Son, Inc., R.H. Brownsberger, Herb Brownsberger, and Rick Brownsberger*, Case No. CV181–121CC. The petition alleged that $96,084.09 was still due and owing on the indebtedness created by the note and security agreement of April 1, 1980; that "during the period of said obligations created as hereinabove set forth, and more particularly during the summer months of 1981, the Defendants, and each of them, did remove wheat crops which were security under the terms of said financing arrangements, and did dispose of same without making the payment therefor to the Plaintiff herein"; and that "soy bean crops, which were also security under the terms of the said financing arrangements as stated herein, are due to be harvested during the month of September 1981 and . . . Plaintiff will be entitled to immediate possession of all of said crops now in the possession of the Defendants, and the Plaintiff may be in danger of losing said crop unless said Defendants, and each of them, are restrained from making disposition of same after they have been harvested." It was this lawsuit which was settled by issuance of the new promissory note of November 30, 1981, in the

not have taken place. "Accord and satisfaction is to be distinguished from novation in that the latter is a mode of extinguishing one obligation by the acceptance of a new promise in substitution for a previously existing claim, while in the ordinary case of an accord and satisfaction, it is not the new promise itself, but the performance of the new promise that is accepted as a satisfaction." *Id.* sec. 2, p. 518, n. 6. But, as is pointed out in the text of this memorandum, the novation issue is one which a state court of competent jurisdiction should decide before the federal court makes its dischargeability determination.

sum of $88,488.23 and the taking of a new deed of trust in Missouri property exclusively. The Florida property which is said to have been falsely represented to be the plaintiffs' property on April 21, 1980, when the initial agreement was entered into, does not appear to have been relied upon in taking the new security agreement. It was this new note and security agreement on which the plaintiff ultimately brought suit in the Circuit Court of Bates County, in *Central Cooperatives, Inc., v. R.H. Brownsberger et al.*, Case No. CV182–68CC, and on which it recovered judgment of $115,653.18 plus interest on September 26, 1983.

3. The conclusionary nature of the pleadings did not permit the court to discern that there may be issues to be determined which were outside the ambit of its jurisdiction. But, as noted in note 2, *supra*, the new security taken was security other than the Florida property which had been contended to be the subject of the fraud in the initial application of April 21, 1980, for credit.

4. See note 3, *supra*.

5. An order of August 24, 1984, initially set the trial for October 24, 1984. On December 14, 1984, after a continuance from the October 24, 1984, date had been granted, the trial was reset for January 11, 1985. On January 17, 1985, the trials were reset for January 31, 1985. On February 12, 1985, trial was reset for June 7, 1985; and, on June 14, 1985, trial was reset for July 18, 1985. All of these resettings were accomplished on the oral requests of the parties. On July 17, 1985, another motion for continuance was filed by the plaintiff, but was denied. An initial hearing was held on June 7, 1985, and the adjourned hearing was held on July 18, 1985.

6. Briefing was concluded only on October 18, 1985, when the plaintiff moved to strike the

ultimately held on June 7, 1985, and on July 18, 1985.[7] Thereafter, the parties filed their briefs to and including October 16, 1985,[8] at which time the court took the matter under advisement.

In the meantime, the abovementioned trial, which was held on June 7, 1985, and July 18, 1985, was consumed by the respective parties in adducing evidence relative to the issue of whether the Osage Production Credit Association was induced by the false financial statement into extending the cash advances pursuant to the line of credit and in demonstrating that the defendants created other liabilities by failing or refusing to turn over the proceeds of the sale of certain collateral to the plaintiff.[9]

The assumption on which this evidence was based, however, was that the underlying indebtedness as to which the determination of dischargeability *vel non* should be made was the indebtedness created by the initial extension of credit on April 1, 1980. This is the indebtedness as to which

defendants' brief which had been filed on September 15, 1985.

7. See note 5, *supra.*

8. See note 6, *supra.*

9. To summarize quickly the evidence which was then adduced, it might be said that the evidence presented by the plaintiff was to the effect that the initial financial statement inducing the loan of April 1, 1980, was materially false in that it purported to include ownership of certain Florida property. Otherwise, it was asserted that some $43,976.89 in crops and crop insurance, in which plaintiff had a security interest, was converted by the defendants in 1980.

10. As stated by the plaintiff in its posttrial brief, "(t)he facts that give rise to this litigation occurred in the spring of 1980. At that time the Brownsbergers applied for a loan for the purpose of putting in the crops for the 1980 year. They completed a financial statement (Exhibit 2) listing their assets and liabilities. Among the assets were six acres located in Dade County, Florida, valued at $300,000.00. That property had been included in financial statements in the previous years although the value varied between $200,000.00 and $300,000. Kent Richardson, the General Manager of 'Central Coop' testified that he relied upon the Dade County property in recommending the loan to Osage Production Credit Association for the reason that the equipment, livestock and other liquid assets had a greater likelihood of dissipating or changing

the character of the financial statement which induced it and defendants' conduct with respect to the collateral which secured it, would be relevant.[10]

But, under the governing law of the State of Missouri, that was not the indebtedness of the defendants to plaintiff which was in effect as of the date of the filing of the defendants' bankruptcy petition on November 8, 1983. "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *Vanston Bondholders Protect. Com. v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). This principle is strongly reinforced by the Bankruptcy Amendments and Federal Judgeship Act of 1984, under which the federal courts are to grant deference to the principles of state law in the area of bankruptcy[11] and the

as opposed to the real estate. Richardson also testified that the Dade County real estate was unencumbered. R.H. Brownsberger testified that Richardson told him he didn't care about the Dade County property and originally didn't even want it on the financial statements .... [T]he property [was] transferred to Brownsberger and Sons on or before July 26, 1978, and it is not likely that it belonged to Richard Herman Brownsberger in March of 1978, when he listed it as one of his assets."

11. See, e.g., section 1334(c)(1), Title 28, United States Code, which grants the district court the power permissively to abstain "from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11" in "the interest of justice, or in the interest of comity with State courts or respect for State law." Even more favorable to state court jurisdiction is section 1334(c)(2) of the same title, requiring abstention in related cases in which a state court could timely proceed to judgment. That provision does not apply to this action, which arises in a bankruptcy case which was already on file when the Bankruptcy Amendments and Federal Judgeship Act of 1984 became effective. "The mandatory abstention statute, section 1334(c)(2), Title 28, United States Code, does not apply in actions (in cases) filed before July 10, 1984. See section 122 of P.L. 98–353, to the pertinent effect that 'Section 1334(c)(2) ... shall not apply with respect to cases under title 11 of the United States Code

bankruptcy courts are themselves not to adjudicate actions which arise under state law. Under the governing state law, from the evidence which has been presented, it appears that a novation may have occurred when the plaintiff accepted the note of November 30, 1981, and took a security interest in certain tracts of real estate as collateral therefor. "Novation may be broadly defined as a substitution of a new contract or obligation for an old one which is thereby extinguished. More specifically, it is the substitution by mutual agreement ... of a new debt or obligation for the existing one, which is hereby extinguished ... The controlling element in determining whether a novation has been accomplished is the intention of the parties." *W. Crawford Smith, Inc. v. Watkins*, 425 S.W.2d 276, 279 (Mo.App.1968). Thus, if there was a novation, the new debt was, by operation of state law, *substituted* for the one which the plaintiff claims to have been created by nondischargeable fraud. Thus, the indebtedness claimed to be nondischargeable may no longer exist. And, as to the *substituted* indebtedness, the plaintiff appears to have made no suggestion that it has a nondischargeable character.[12] The only potential ground of nondischargeability which the files and records show *possibly* to exist with respect to the substituted debt is that of hopeless insolvency. "A mere promise to be executed in the future is not sufficient to make a debt nondischargeable, even though there is no excuse for the subsequent breach. A misrepresentation by the bankrupt of his intention, however, may constitute a false representation within the exception." 1A Collier

on Bankruptcy para. 17.16, pp. 1638–1640.1 (14th ed. 1978). And one who has no ability to pay for purchases and no prospect of such ability is held to have falsely represented an intention to pay. "Thus, a purchase of goods on credit by a bankrupt who does not intend to pay therefor, constitutes a false representation, although there is authority to the contrary. To require an overt misrepresentation where hopeless insolvency makes payment impossible is an unduly restricted interpretation of the purposes of the Act." 1 A Collier on Bankruptcy ¶ 17.16, pp. 1638–40.1 (14th ed. 1979). But the plaintiff has not presented any affirmative evidence of such potential nondischargeability.[13]

▉ It appears from these considerations that, if an actual novation has taken place, the plaintiff may no longer claim the existence of the initial underlying debt, even if it is based on fraud. "The authorities are unanimous in holding that where one has been induced by fraud to enter into a contract and, after discovery of the fraud, enters into an agreement concerning the subject matter of the contract, or demands and receives from the other party any substantial concession in respect of the transaction, he is conclusively deemed to have waived any claim for damages on account of fraud." *Phillips Petroleum Co. v. Rau Const. Co.*, 130 F.2d 499, 502 (8th Cir.1942), and Missouri cases there cited. In this case, the evidence does not show with any clarity whether the plaintiff knew of the fraud complained of with respect to the April 1, 1980, extension of credit at the time of execution of the new promissory note on November 30, 1981.[14]

---

that are pending on the date of enactment of this Act, or to proceedings arising in or related to such cases.' ... The permissive abstention statute, section 1334(c)(1), Title 28, United States Code, applies, however, and it is difficult to believe that, in passing on the question of permissive abstention, the district court would not be swayed by the letter of section 1334(c)(2), *supra*, in deciding whether it might not be an abuse of discretion not to abstain." *Matter of Titan Energy, Inc.*, 57 B.R. 498 (Bkrtcy.W.D.Mo. 1986).

**12.** See notes 1 and 9, *supra*.

**13.** But such a showing would have to be made at least by reference to the schedules in these cases and the court has not been requested to take judicial notice of them.

**14.** It is the assertion of the plaintiff in its briefs that it continued to rely upon the initial financial statement in entering into the new agreement of November 30, 1981. But the evidence is conflicting on this issue and the defendants sharply disagree, contending that the plaintiff's witness's testimony is self-contradictory on this issue alone. And it appears that the alleged fraud was easily discoverable prior to Novem-

Nor does it show with any conclusiveness whether the specific conversions complained of were known of by the plaintiff, although the pleadings filed in the state court proceedings on September 30, 1981, would indicate that they were.[15] But the determination as to whether there has been a novation is a factual one which arises exclusively under state law.[16] Accordingly, this court is forbidden to make the determination by the clear holding of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 13 L.Ed.2d 598 (1982).[17] These actions must accordingly be dismissed in favor of litigation in the state courts,[18] where it appears that the applicable statutes of limitation have not run out.[19] It is therefore

ADJUDGED that the within complaints for relief be, and they are hereby, dismissed without prejudice.

ber 30, 1981. But, on the evidence before the court, this issue cannot be resolved by this court.

15. See note 2, *supra.*

16. See, e.g., *Durasteel Co. v. Great Lakes Steel Corp.*, 205 F.2d 438, 441–444 (8th Cir.1953). The issue is one which touches only upon the issue of the existence *vel non* of the underlying debt and, except that it is determinative of this action, has no relation to the elements of proof in respect of the issue of dischargeability *vel non.* It is the underlying action arising under state law which, in these actions is incidental to, but determinative of the dischargeability issue, rather than *visa versa*, as is the case in most dischargeability actions. See, e.g., *Matter of Naughton*, 44 B.R. 670, 673 (Bkrtcy.W.D.Mo. 1984). It is not possible, therefore, for the bankruptcy court to take jurisdiction of these actions on the frequently-employed (but somewhat questionable) ground that the underlying state action is *only* "incidental" to the dischargeability determination. For, as observed above, it is the dischargeability determination which is dependent upon, and therefore must await, the underlying determination under state law.

17. The action in this case arises purely under state law, see note 16, *supra.* "If the decision turns on the existence *vel non* of the underlying

liability, it is an action which arises under state law, see *Matter of Naughton*, 44 B.R. 670 (Bkrtcy.W.D.Mo.1984), which the bankruptcy court cannot determine under the rule of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). For this court to interpret the jurisdictional statutes to confer the jurisdiction and power to hear and determine such disputes upon the bankruptcy court runs the decided risk of converting an Article I court into an Article III court. 'It has historically been held that the designation placed by Congress on a court as an Article III court or a non-Article III court is not controlling; the question is whether any of the federal judicial power is conferred upon the court in question ... (and) it has in the past been held that a court initially created as a non-Article III court may "mature" into an Article III court by reason of being assigned a portion of the federal judicial power.' *Matter of Richardson*, 52 B.R. 527, 534 (Bkrtcy.W.D.Mo. 1985)." *Hereth v. Schwaninger*, 57 B.R. 553 (Bkrtcy.W.D.Mo.1986).

18. See note 11, *supra.*

19. See section 516.110(1) PSMo, to the effect that ten years is the limitations period for "an action upon any writing, whether sealed or unsealed, for the payment of money or property."