**In the Matter of James Albert CURL and Cathy J. Curl, Debtors.**

**SUR GRO PLANT FOOD COMPANY, INC., Plaintiff,**

v.

**James A. CURL and Cathy J. Curl, Defendants.**

**Bankruptcy No. 84–00412–SJ.**

**Adv. A. No. 84–0339–SJ.**

United States Bankruptcy Court, W.D. Missouri, St. Joseph Division.

Feb. 14, 1986.

James H. Thompson, Jr., Kansas City, Mo., for plaintiff.

Mark G. Stingley, Utz, Litvak, Thackery and Taylor, St. Joseph, Mo., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND

FINAL DECREE AND JUDGMENT DENYING COMPLAINT

FOR A DECREE OF NONDISCHARGEABILITY

DENNIS J. STEWART, Chief Judge.

This is an action for a decree of nondischargeability of an indebtedness allegedly

brought into being by a false financial statement within the meaning of section 523(a)(2) of the Bankruptcy Code. After joinder of the issues by the pleadings, the action came on for trial of its merits before the bankruptcy court on June 28, 1985, and September 13, 1985, in St. Joseph, Missouri, whereupon the plaintiff appeared by counsel, James H. Thompson, Jr., Esquire, and the defendants appeared personally and also by counsel, Mark G. Stingley, Esquire, and John Manring, Esquire. The evidence which was then adduced warrants the following findings of fact.

### Findings of Fact

On November 14, 1981, the defendant James A. Curl rendered a financial statement to the plaintiff for the purpose of inducing it to extend him some form of credit.[1] In this financial statement, the amount owed by the debtors to the Farmers Home Administration was understated by some $80,000.[2] On February 21, 1983, a second financial statement was rendered by the defendant James A. Curl. In this financial statement, the debtors' indebtedness to the Farmers Home Administration was drastically misstated as $56,000, whereas, in truth and fact, the amount of the indebtedness was $381,473.23. Further, the entire indebtedness then owed to the Commodity Credit Corporation, $37,488.89, was wholly omitted from the financial statement of February 21, 1983. And half of the livestock described in the financial statement, having a total value of $110,500.00, were in fact not the property of the debtors but were in fact owned by the father of James A. Curl. The fact of that division of ownership was not disclosed in the financial statement. The evidence which was adduced by the plaintiff showed that the false financial statements were subscribed by the defendant James A. Curl only; that they were not signed by the defendant Cathy J. Curl; and that there is really no evidence that James A. Curl acted as the agent of Cathy J. Curl in subscribing the financial statements.[3] The evidence further shows that the plaintiff, in making the extensions of credit to the defendants, took a security interest in a significant portion of the chattels owned by the defendants.[4] The testimony of the plaintiff's managing officer, given in a deposition of April 16, 1985, serves to demonstrate the "new" or "fresh" money actually extended in reliance upon the false financial statements which are complained of. In the course of that testimony, the plaintiff's managing officer testified that the balance of loans for "crop inputs" which existed as of the date of the deposition was $30,494.45 (tr. 12); that, of that amount, "(t)here is an amount ... of $1,803.36 that was applied in September and October of '81"; that "there was (also) an amount of $6,000 loaned to Jim Curl on July 31, '81"; and that the resulting difference is $22,291.09, a figure which is further reduced to $21,121.04 when the applicable interest on the principal loaned prior to November 14, 1981, is taken into account.[5]

The plaintiff's managing officer, as to these loans for "crop inputs," further testified that a security interest was taken by

---

1. The financial statements which have been adduced in evidence bear the solitary signature of James A. Curl. None has been subscribed by the defendant Cathy J. Curl.

2. In the financial statement of November 14, 1981, the defendant James A. Curl lists his liability to the Farmers Home Administration as $160,000. The evidence shows without contradiction that he in reality owed the Farmers Home Administration the sum of $246,548.04 as of that date.

3. See page 18 of the text of this memorandum, *infra*.

4. See page 3 of the text of this memorandum, *infra*.

5. The evidence, as is observed in the text of this memorandum, is that the sum of $30,494.45 was in total due as of the date of bankruptcy. The request for relief is in the sum of $39,714.50. Therefore, the court infers that the $9,220.05 difference is interest for a period of approximately two years dating from the time of the final incurrence of the obligations for "crop input" loans. This would mean an interest rate of approximately 15% per annum, or the sum of $1,170.50 on the $7803.36 loaned not in reliance on either of the false financial statements.

the plaintiff in livestock and crops (tr. 14). In his initial testimony on the subject he seemed to state that sole reliance was placed upon the security interests. See tr. 15 to the following effect:

Q. (by Mr. Stingley, defendants' counsel) "So is it a fair statement that you were relying upon the livestock and the crops from the financial statement to go ahead and make the loan and to rewrite the previous loans?

A. "That's right."

In his later testimony, however, the managing officer disavowed that sole and exclusive reliance was placed upon the security interests. See tr. 23 to the following effect:

Q. (by Mr. Stingley) "Wouldn't you, in a normal situation on your inputs, don't you rely upon the crop normally and take you out of your input loans?

A. "For new inputs, yes."

Q. "And that's what you relied upon in this case?

A. "It was a combination."

Q. Why don't you explain to me what you mean by a combination?

A. It was a combination of the livestock and the crops. Our experience for the prior year was not good in regard to the crops because many of the crops disappeared into the livestock, and so that we felt we needed to have the livestock mortgaged in order to collect for the crops that were going into them."

In the complaint which was initially filed by the plaintiff, the sum of $39,714.50 is said to have been due and owing as of the date of bankruptcy.[6]

### Conclusions of Law

The authorities which govern the making of a determination of dischargeability *vel non* are agreed that the nondischargeability statute, section 523 of the Bankruptcy Code, must be given a strict, literal construction so that the burden of proving each and every element of the cause of action is upon the plaintiff. *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975). Proof of each element must, moreover, be by clear and convincing evidence. *Matter of Curl*, 49 B.R. 302, 304, n. 6 (Bakrtcy.W.D. Mo.1985). With respect to the species of nondischargeability which may lie for misrepresentation under section 523(a)(2) of the Bankruptcy Code, the following elements of the cause of action must be proven by the plaintiff:

"(1) the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations, and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made."

*Sweet v. Ritter Finance Co.*, 263 F.Supp. 540, 543 (W.D.Va.1967). According to the above findings of fact, the court has little difficulty in finding and concluding that the defendant James A. Curl made knowing and material misrepresentations in the two financial statements which have been made the basis for this action. Although he adverts in his testimony to the fact that a bank officer took the information for the statements and that he was sometimes unsure what was being requested, there is no question that he signed the statements and that he knew their contents and that he knew that they were grossly and materially inaccurate.[6a] But the evidence which has been adduced leaves lingering questions as to whether there was reasonable reliance upon the misrepresentations and, if so, whether damage resulted from such reliance. It is a staple of bankruptcy law that a decree of nondischargeability may be issued only for the "new money" or "fresh cash" actually extended in reliance on the false financial statement. See, e.g. *In re Danns*, 558 F.2d 114, 116 (2d Cir.1977)

---

**6.** This is the amount prayed for in the plaintiff's complaint.

**6a.** In view of the sizes of the liabilities not disclosed, the protestations to the contrary made by the defendant James A. Curl are simply not credible.

("There is nothing in the legislative history of the 1960 amendments to indicate a congressional intent that a bankrupt should be penalized for more than simply the consequences of his fraud. Nor does it seem equitable for a bankrupt to be deprived of discharge on all his indebtedness to a particular creditor simply because a small portion of it was procured dishonestly."); *Matter of Etcheson*, 47 B.R. 8, 11 (Bkrtcy.W.D. Mo.1984) (" 'If the creditor does not forfeit remedies or otherwise rely to his detriment on a false financial statement with respect to existing credit, then an extension, renewal, or refinancing of such credit is nondischargeable only to the extent of the new money advanced.' " 124 Cong.Rec. H 11,-095–6 (Sep. 28, 1978); S 17,412–13 (Oct. 6, 1978."); *Matter of Peterson*, 437 F.Supp. 1068, 1070 (D.Minn.1977) ("The court is of the opinion that the better rule of law ... is to limit nondischargeability to that portion of the loan actually given in reliance upon the false statement, i.e., the new money advanced."). Under this rule, the most that could be said to be appropriate as a matter of damages is the $21,121.04 adverted to above as the "crop input" loans extended after the date of the initial false financial statement, November 14, 1981.

■■■■ But the proof in this action leaves it gravely in doubt as to whether the entire sum of $21,121.04 was the amount of damage which was actually sustained by reason of reliance on the false financial statements. As observed above, the testimony of the plaintiff's managing officer was to the effect that sole reliance was placed upon a "combination" of the security interests in the crops and livestock. In this regard, it must be noted that the courts have, under circumstances similar to those in the action at bar, denied the decree of

nondischargeability when it could be said that reliance was placed on a security interest rather than upon the contents of the false financial statement. See *Matter of Gunter*, 12 B.R. 242, 244 (Bkrtcy.M.D.Fla. 1981) ("The Court is satisfied that the bank did not *reasonably* rely on the financial statement. First of all, the bank financed the boat on a fully secured basis and could look to its security rather than the strength of the financing statement."); *Miles Employee Credit Union v. Griffin*, 22 B.R. 821, 824 (Bkrtcy.W.D.Ohio 1982) ("The Court also notes that, in light of the circumstances, the additional fact that security was taken to guarantee repayment of the debt is itself indication that Plaintiff's decision to extend credit was not in reliance upon the credit information.") As observed above, in this action, the plaintiff's managing officer admitted that reliance was placed on a "combination" of the security interest in the "livestock" and a security interest in the "crops." He did not mention reliance on the false financial statement as any part of the reliance in making the "crop input" loans to the defendant James A. Curl.[7] This court is aware that the defendant James A. Curl admitted in his testimony in this action that some of the livestock contained on the financial statements was in fact not his. But there is no evidence that the remaining value of crops and livestock was not sufficient to cover the loans in question in this action. This is especially so when the defendant James A. Curl testified in the action at bar that, even discounting the livestock which actually belonged to his father, he owned at least 250 hogs weighing approximately 40 pounds apiece, the value of which must have totaled around $5,000 and the schedules in the debtors' chapter 7 case

---

7. In its posttrial brief, the plaintiff asserts that "in testimony before this Court at a hearing on June 28, 1985 ... both the representative of Plaintiff, Sur Gro Plant Food Company, Inc., James Rakestraw, and the Defendant, James Curl, testified that Sur Gro Plant Food Company, Inc. relied on these statements and that Defendant Curl intended that Sur Gro Plant Food Company, Inc., rely on these statements." Plaintiff's Reply Brief filed October 29, 1985.

But the court is justified in relying on the earlier, more particular statement of Mr. Rakestraw which is recounted in the text of this memorandum, which, whether considered as a prior inconsistent statement or as substantive evidence, is sufficient to make the subsequent and general statement that the financial statements were relied upon not credible. Further, the particular, in construing evidence as in construing instruments, controls over the general.

purport to show the existence of $17,500 in value of livestock as of the date of bankruptcy.[8] Mr. Curl's testimony to this effect is uncontradicted, and the plaintiff has not adduced evidence which would apprise the court of the value of the security relied upon and either already taken or available to satisfy its outstanding balance. As noted above, this court believes it to be the burden of the plaintiff in proceedings for a decree of nondischargeability to demonstrate with precision the damages which flow from the claimed detrimental reliance. "(E)stablishing the fact of damages is the responsibility of plaintiff." *W.G. Cornell Co., v. Ceramic Coating Co.*, 626 F.2d 990, 994 (D.C.Cir.1980). "To warrant damages, the evidence must demonstrate that the party seeking to recover has sustained some injury and must establish sufficient data from which the jury [or other trier of fact] could estimate the amount." *Pemberton v. OvaTech, Inc.*, 669 F.2d 533, 541 (8th Cir.1982).[9] The evidence in this action, for the reasons stated above, neither demonstrates the fact of injury nor does it demonstrate that, if there was injury, any basis for an award of damages. In fact, according to the considerations stated above, such evidence as is before the court warrants an inference that there was no reliance on the false financial statement and no injury sustained because of the admitted reliance on the security interests taken to the extent that new value or fresh money was extended. Judgment must therefore be awarded in favor of the defendants and against the plaintiff on the plaintiff's claim for damages.[10]

It must finally be found that, even if, after reconsideration or review, it is ultimately found that liability should be fastened upon the defendant James A. Curl, there is no evidence that he acted as the agent of Cathy J. Curl in executing the financial statements. According to her uncontradicted testimony in this regard, she never saw the financial statements in question, had no communication with Mr. Curl about them, and had not otherwise indicated to Mr. Curl that he could sign them in her behalf.[11] Nor is there any evidence

---

8. Further, even if it is admitted that half of the cattle belonged to the father of James A. Curl, there remained, according to this calculus, some $55,250 in value of livestock, at least, to collateralize these "crop input" loans—without even giving any consideration to the crop income, as to which there is no evidence.

9. In the hearing of June 28, 1985, Mr. Rakestraw testified that he had discovered an "earlier UCC filing" by the Farmers Home Administration or another entity on the collateral. But it is not demonstrated that this filing would have taken the value which would have foreclosed payment out of the livestock. Mr. Rakestraw agreed that there "should have been" enough livestock for the plaintiff to be paid off, using that collateral as the source of payment.

10. This court has some reservation in determining the issue of damages, which arises under state law, when it, in turn, in this action, controls the issue of dischargeability *vel non.* "It is the underlying action arising under state law which, in these actions is not incidental to, but rather determinative of the dischargeability issue, rather than *visa versa,* as is the case in most dischargeability actions ... It is not possible, therefore, for the bankruptcy court to take jurisdiction of these actions on the frequently-employed (but somewhat questionable) ground that the underlying state action is *only* 'incidental' to the dischargeability determination. For,

as observed above, it is the dischargeability determination which is dependent upon, and therefore which must await, the underlying determination under state law." *Matter of Brownsberger,* 61 B.R. 22, 27 n. 16 (Bkrtcy.W.D. Mo.1986). In this action, however, there appears to be no issue of fact. The court, as is pointed out in the text of this memorandum, has made its decision based on the plaintiff's own evidence, and the plaintiff has been unable to adduce evidence which would show the existence of damages. "In order to command a right to attention and determination by a court of plenary jurisdiction, the parties must demonstrate that there is a genuine issue to be resolved by it ... And on the issue of the existence and magnitude of debt, the defendants have not made any factual issue. Accordingly, it seems proper for the bankruptcy court to proceed to the entry of judgment. While it is true that the current bankruptcy statutes give little vent to the concept of consent jurisdiction, it does not appear that the courts should be put to unusually complicated tasks in order to recognize what amounts to a consent judgment or stipulation on the issue of liability." *Matter of Colin,* 44 B.R. 704, 708 (Bkrtcy.W.D.Mo.1984).

11. In the evidence in this action, there is no set of circumstances showing the systematic division of authority which created the implied agency in *Matter of Kinney,* 16 B.R. 664 (Bkrtcy.

that she knew of the false statements contained in the financial statements.[12]

Accordingly, for the foregoing reasons, it is hereby

ORDERED, ADJUDGED AND DECREED that the plaintiff's within complaint for a decree of nondischargeability be, and it is hereby, denied and that judgment be, and it is hereby, entered for defendants on the plaintiff's claim for damages.[13]

---

W.D.Mo.1981). The evidence simply shows a lack of knowledge of the signing of the agreement on the part of Mrs. Curl.

**12.** See *Matter of Walker,* 726 F.2d 452, 454 (8th Cir.1984) ("Proof that a debtor's agent obtains money by fraud does not justify the denial of a discharge to the debtor, unless it is accompanied by proof which demonstrates or justifies an inference that the debtor knew or should have known of the fraud."). But cf. *Matter of Walker,* 53 B.R. 174, 179 (Bkrtcy.W.D.Mo.1985) ("[T]he fraud of an authorized agent, without more, has continually been recognized as a ground of nondischargeability, although it takes the knowledge or reckless disregard of the principal to deny the latter's discharge in bankruptcy.") In this action, however, the agency of James A. Curl for Cathy J. Curl is not established. See note 11, *supra.*

**13.** With respect to the principle on which this decision is mainly based—that the plaintiff relied on the security interest rather than the financial statement—it must be observed that some decisions, dealing with the subject of denial of discharge under the former Bankruptcy Act, hold that reliance on a security interest does not preclude denial of discharge if the financial statement is materially false. See, e.g., *McDowell v. John Deere Industrial Equipment*

*Co.,* 461 F.2d 48 (6th Cir.1972); *Swint v. Robins Federal Credit Union,* 415 F.2d 179 (5th Cir. 1969); *In re Bernstein,* 197 F.2d 378 (7th Cir. 1952); *Banks v. Siegel,* 181 F.2d 309 (4th Cir. 1950); *In re Axel,* 103 F.Supp. 810 (S.D.N.Y. 1951); *In re Slohm,* 10 F.Supp. 351 (W.D.N.Y. 1935); *Matter of Lind,* 6 B.R. 374 (Bkrtcy.S.D. Tex.1980). But these decisions are not applicable to the issue of nondischargeability *vel non.* These cases essentially hold that even partial reliance on the false financial statement is sufficient to deny discharge. But, under the authorities which govern the issue of reliance in nondischargeability actions, even entire reliance on a security interest would be insufficient to render the indebtedness nondischargable if no damages resulted from the reliance otherwise on the false financial statement. "The concept of nondischargeability of a debt under section 523 is not to be confused with the denial of discharge under section 727." 4 Collier on Bankruptcy para. 727.01, p. 727–6, n. 5 (15th ed. 1985). It is commonly said that the denial of a discharge is intended to penalize the misconduct of the debtor, while a decree of nondischargeability is to preserve the indebtedness itself. Thus, while the court must focus on the conduct of the debtor, primarily, in considering an objection to discharge, it must focus on the character and amount of the liability, if any, in determining the issue of dischargeability *vel non.*